131 626
15L 451
1pi 124

BESSIE M. JOHNSON, Aministratrix, v. ANDREW J. PATTERSON, Administrator, et al.

1. ADMINISTRATION. A personal representative has no power to convert personalty into realty, and if he does so, it will be considered in equity as personalty and distributed accordingly.

2. REAL ESTATE. The most controlling test as to whether property connected with real estate is to be deemed realty or a mere chattel, removable at pleasure of owner, is the intention and purpose of the creation.

3. ADVANCEMENT. An advancement is a gift by a parent in presenti of a portion of the share of his child in his estate which would fall to each child at the parent's death, by the statute of distribution or descent.

4. SAME. The intention to make a gift and not an advancement, must be shown by clear and unmistakable proof, to be arrived at from a survey of the conduct and conversation of the donor at or about the time of the gift.

5. SAME. Interest on. Interest should be charged on advancements from the time of the death of the ancestor.

6. CHANCERY PRACTICE. Objection to evidence. Exception to the relevancy or admissibility of matter testified to by a witness, m y

made by exceptions to a report of the clerk and master based on such evidence, but a general exception to the competency of the particular witness does not reach the matters of his testimony, if the witness be in fact competent. Such objection goes to the individual and not to the matter. So an objection to an entire deposition when part of it is competent, and part not, will not be noticed by the Supreme Court.

7. EVIDENCE. *Attorney.* Under the Code, section 4754, does not include transactions between attorney and client, that have no element of confidence in them, of which he is competent to testify, *e. g.*, he may prove his client's hand-writing, what money was collected by him, when paid over and to whom paid.

---

### FROM GREENE.

---

Appeal from the Chancery Court at Greeneville. H. C. SMITH, Ch.

J. T. & JNO. K. SHIELDS, A. B. WILSON and H. H. INGERSOLL for complainants.

ROBINSON & MALONEY and THOMAS CURTIN for defendants.

FREEMAN, J., delivered the opinion of the court.

This bill is filed to settle the estate of the late President, Andrew Johnson, who died July 31, 1875.

Soon after his death his widow administered on his estate. She, however, died in six or eight months, and then his only surviving son, Andrew Johnson, Jr., was appointed administrator *de bonis non.* After this, in March, 1879, Andrew Johnson, Jr., died, it being about three years after his appointment. He left complainant his widow and only distributee, and his two sisters, defendants, Mrs. Stover and Mrs. Patterson, as

his heirs. His widow, the complainant, has been appointed administratrix of her husband, and Andrew J. Patterson, administrator *de bonis non* of his grandfather, Andrew Johnson, Sr.

On October 8, 1879, complainant filed this bill as administratrix of her husband, and in her own right for a settlement of the estate of Andrew Johnson, Sr., a general account of the same, and in addition, an assignment of dower in the lands in which her late husband died seized.

This case was before us two years since, when it was fully and ably argued, but the main questions were not then decided, the appeal being premature before a final decree. It comes now after a final decree, with a report of the Referees, to which exceptions are filed by both parties. We will first dispose of the matters raised by the exceptions on the two leading questions of law debated before us, to-wit, whether the "brick cotton factory" property is to be treated as personalty or realty in the distribution of the estate, and whether the Henderson farm given to Mrs. Patterson is to be treated as an advancement, and be accounted for as such or not? We need not state the terms of the exceptions, as the points raised will readily be seen from the statements of this opinion.

A short statement of facts in reference to each will serve to raise the points to be decided. When Andrew Johnson, Sr., died, he had a debt on one Prather, due by note for the sum of $10,000, bearing interest at the rate of ten per cent per annum for money loaned to start and carry on a cotton manufacturing

·establishment. This debt was secured by a deed of trust to Thomas Maloney, conveying the brick cotton factory with the two acres of land on which it stood, with all the machinery and fixtures of all kinds in said cotton factory, consisting of six spinning frames and attachments necessary to operate the same, etc., with all appurtenances connected with or belonging to said cotton factory, with power to sell on default as is usual in such cases.

Some additions were probably made to the machinery by Prather after making the deed, but this is not deemed important on the questions presented.

.During the administration of Andrew Johnson, Jr., default having been made in. paying the debt secured or interest provided for, he required the trustee to proceed with the execution of his trust, and sell the property conveyed to him in order to realize the debt secured. This, no doubt, was concurred in by all the parties. Maloney advertised and sold the property in accord with the provisions of the trust deed, and the same was bought by the three heirs—Andrew, Jr., Mrs. Patterson and Mrs. Stover, for the sum of $10,500, leaving after deducting expenses of the sale something over $500 of the debt then due, unpaid. Maloney conveyed the property so sold to these purchasers, by a deed referring to the deed of trust of Prather for a fuller description of the same—and they went into possession of the same, and remain in possession, except Andrew, who is dead, but he was in possession until his death.

On these facts substantially it is claimed in the

bill, and urged in argument that the purchase was made by these three persons as heirs of Andrew Johnson, not as an investment, but as a means of realizing the debt due the estate—not with the purpose of converting the debt into real estate—and it is therefore maintained the said real estate so purchased is to be treated as personalty for the purposes of distribution.

In addition it is said argumentatively in the bill, that much of the "property was and is strictly personal property, and does not come within the definition of real estate, the whole having been purchased as a security for said debt."

The principles may be assumed as correct that a personal representative has no power to convert personalty into realty; and if he does so, it will be considered in equity as personalty and distributed accordingly: *Roberts* v. *Jackson,* 3 Yer., 79, and cases cited. But we are unable to see how the facts of this case come within the principles cited. It was not a purchase by the administrator at all, but by himself and his two sisters, who were the heirs and distributees, to whom the debt would have gone in process of distribution, had it been collected in money, as it is, they have bought the property as tenants in common, and as such took the title and hold it. They owe the money, as on a joint purchase, and would have to account for it in distribution of the estate—but as they are each entitled to the amount they owe, the settlement can be made in this way without actual payment, as this case stands—there being a large

Johnson v. Patterson.

surplus for distribution. But had the money been needed for the payment of debts, or there had been other distributees not joining in the purchase—they would have been compelled to pay the entire price in the one case, and in the other sufficient *pro rata*, to make up the interest of the other legatee, as it is the matter can be settled by a charge and discharge in taking the account of distributive share of each of the parties.

As to the point suggested in the bill, that much of the property was strictly personalty, and not realty; alluding as we learn from argument of counsel to the machinery making up a part of the cotton factory conveyd, we need say but little. The complainant stands in the shoes of her deceased husband in asserting the position that the machinery making part of the cotton factory is personalty. It is beyond question, that he and the co-purchasers purchased the whole property as one property, and treated it as such. The intent was to either use it permanently as such, and as a whole, or to sell it as a whole. Most certainly the parties did not intend to become owners as tenants in common of the brick house erected for the purpose of the enterprise, and to hold the machinery as personalty, with the right to divide it among them as such. It would probably, if not certainly have been impossible for them so to divide it, without rendering it useless for all practical purposes. Modern authorities all agree, that the most controlling test of the question, whether property connected with real estate is to be deemed realty or a mere chattel,

removable at pleasure of owner, is the intention and purpose of the erection: See *McDavid* v. *Wood*, 5 Heis., 98; *Saunders* v. *Stalling*, 5 Heis., 72; *Connor* v. *Hare*, 1 Tenn. Ch., 25; Wait's Act. & Def., vol. 2, 369, and cases cited. But the intent and the nature of the property taken as a whole, as the parties purchased it, and treated it, concur in making it a part of the freehold, and stamping it as realty, and it must so be held.

The next question to be determined is, whether a certain tract of land, known as the Henderson farm, containing about five hundred acres, valued in assessing for taxation, as since improved, at upwards of $11,000, and for which the intestate paid in 1867, $17,000, is to be treated as an advancement, and charged as such.

This land was conveyed by Andrew Johnson, Sr., in the adjustment of his estate, to his eldest daughter, Mrs. Patterson, February 18, 1873, she having been placed in possession of it in March, 1869.

The conveyance on its face simply shows that it was made "for the love and affection I entertain for my daughter, Martha J. Patterson, I do hereby give, transfer and convey to her, her heirs and assigns," etc. No further purpose is expressed, and the question is to be decided on the rules of law established in such cases, and the legal evidence to guide us as to the intention of the donor when he made the gift.

An advancement is defined by the authorities to be, "an irrevocable gift, by a parent, who dies afterwards intestate, of the whole or a part of what it

is supposed the child will be entitled to on the death of the parent making the advancement": See *Yancey* v. *Yancey*, 5 Heis., 357; Meigs' Dig. by Milliken, vol. 1, p. 74, sec. 11, and Wait's Act. & Def., vol. 1, 205, sec. 1, and cases cited.   A shorter definition is, a gift by a parent *in presenti,* of a portion or all of the share of his child in his estate which would fall to such child at the parent's death by the statute of distribution or descent.

It is seen from this definition that the fact that there is a gift and conveyance of the title does not exclude the idea of an advancement, but that a gift and the title conveyed is an essential feature of it. In order to exclude the idea of an advancement, there must be shown not only a gift, but something additional—a gift, with a purpose that the property so given shall go to that child as something *over* and *above* the share of the other children of the donor.   The purpose must be made out by satisfactory and affirmative testimony, such as the nature of the case will naturally demand, and if the fact be so, will naturally supply.

In view of our statute law on this subject, as well as on sound principles, it is settled that when a gift is shown by parent to a child the presumption of law is that it is intended as an advancement—it is a *prima facie* case (*Morris* v. *Morris,* 9 Heis., 817), which means, that a case of advancement is fully made out, justifying or demanding a decree by a court to that effect until the contrary case is made out by a fair preponderance, that is, the proof shall show sat-

isfactorily a contrary purpose. If the case should stand in equipoise on the proof, then the party seeking to assert the over portion having the affirmative must fail.

This is evident from the requirements of the Code as well as the principle underlying all our decisions on this question, as will be seen by the cases: Meigs' Digest, by Milliken, vol. 1, p. 74, sec. 4. The language of the Code, section 2431, would seem to demand that even a strong case, very clear and weighty evidence, should be given in order to overturn the presumption of our law, and the evident policy and purpose underlying it. It is that "absolute equality shall be observed in the division of the estates of deceased ¦persons, except where ·a will has been made and its provisions render equality impossible." The next section requires "all advancements, whether by settlement or otherwise, in the lifetime of the deceased, or by testamentary provision, shall be collated and brought into contribution in the partition and distribution of the real and personal estate of the deceased; those in real estate first in partition of the real estate, and those in personal estate in the distribution of the personal estate." Section 2433 provides for this equality, by requiring collation of an advancement in real estate with the personal estate, where the advancement in real estate exceeds the child's share, and *e converso·* where the amount in personalty shall be found to exceed such share. And by next section it is even provided that "where a power or trust is granted the parent to bestow property conveyed or

settled by the instrument creating the power or trust, in favor of one or more children of such parent, any property given under such power or trust to a child shall be collated and brought into contribution by such child claiming a share in the distribution of the property of the parent."

It might well be held on a literal construction of the first section, that the equality provided for could not be defeated at all, except where a will had been made rendering equality impossible, and in view of the other sections, that all property received by a child in advance of a parent's death, must be brought into the account and charged as an advancement against the child receiving it. Certain it is, these provisions require a clear and unmistakable case of a contrary purpose on the part of the donor to exclude the operation of this well defined policy of our law, that there shall be absolute equality observed in the division of the estates of deceased persons.

The testimony presented in this record on the point involved, that the gift of this land was intended to be over and above the share of the other children of Andrew Johnson, and not be accounted for in the settlement of his estate in the event that has happened, his death intestate, is very meagre. In fact there is none coming from the donor, in connection with the act itself that has any bearing at all tending to aid in the solution of the question.

The facts attending the gift are, that Mrs. Patterson was at his home in Greeneville, and just before she left for the depot to return to her home, her

father gave her the deed in an envelope and told her
not to open the package until she got home.    Mr.
Jones, who had written the deed, and who seems to
have been present at its delivery, says he made a
"neat and touching speech to Mrs. Patterson when he
handed her the deed."    But this witness, though di-
rectly interrogated as to the language used, is unable
to give it.    We think it satisfactorily appears, even
from the statements of this witness, that nothing
was said on the question now under discussion,
for he is asked what impression the language and
conduct of Mr. Johnson made on him, both when
the deed was written, and when delivered, as to the
Henderson farm; says that from the conversation had
with Mr. Johnson when the deed was written, and
what he said when it was delivered, he was impressed
with the idea that he intended to make her a present
of the farm.    It is evident that if any thing had
been said more than this, this witness would have re-
called it, as the basis of his view of the case, and
he would not have forgotten so important a matter
as that she should not be charged with the farm, or
that it was intended to be given over and above what
he should give his other children.    Mrs. Patterson,
however, makes this clear beyond dispute.    She says
nothing of any remarks made at the time of delivery,
except the injunction not to open the package until
she got home.    It is certain if there had been a
word as to intention on this subject she would not
have forgotten it, and giving her testimony under the
heat gendered by this contest, her memory, as the

Johnson *v.* Patterson.

party contesting the question, would have been refreshed as to all that bore favorable upon her side of the contested question. Persons engaged in such a contest are not liable to forget that which favors their own interest. But she has put this beyond all question by swearing positively that her father never mentioned the matter as to whether she was to be charged with this farm or not, either then or at any other time. So we may say it is certain, that neither at the time of the delivery of the deed, or at any subsequent time, was any thing ever said by Mr. Johnson as to his intention on this subject.

We add that Mrs. Patterson does say that she always considered it a gift, and she was not to be charged for it, but no further word in support of this view is shown to have ever been heard by her from the donor supporting this understanding. It can only amount to an opinion by the party in interest.

The testimony of Mrs. Stover, the other sister, so far from affecting this view, strengthens it. She is asked if she knew why her father gave Mrs. Patterson the farm. She answers: "She was the oldest child, naturally energetic, five years older than myself. We all depended on her more or less, and was my father's main support, as my mother was an invalid for many years. She was of great service to him in many respects, privately and publicly. These are some of the reasons why he made the deed of gift of said property." It is evident these are the reasons for the opinion of the witness—but it is certain that if her father had ever given these reasons to her, in

connection with a statement of an intention to give the farm over and above the shares of the other children, she would have promptly stated, as conclusive on the subject, that her father had told her so. The failure to so state makes it certain, that to neither herself or Mrs. Patterson had such a remark or intimation ever been made. There is some other testimony of like kind in the record which we need not notice.

The only testimony that tends to support with any certainty the contention of respondent is that of Mr. Fowler. He shows he was an intimate friend of Mr. Johnson's, and details the services rendered by Mrs. Patterson, as mistress of the Presidential mansion, at Washington, during the administration of her father, and also the keeper of his house during the war at Nashville, and then says he was at Greeneville, at Mr. Johnson's house in 1871. One day while there in his parlor Mr. Johnson spoke of his children, that his sons had been failures, but spoke tenderly of his two daughters—Mrs. Patterson and Mrs. Stover, said he was greatly indebted to Mrs. Patterson for her services at Washington. She had shown great self-denial, and her care and economy had saved him much money and that he then added: "In the course of my business I have become the owner of the farm on which she now resides, and I intend it for her as some compensation for her services rendered during my administration."

This statement of what the witness says is "the substance of his language, and some of his expressions in his exact words," is what the case of respondent must

turn on, so far as anything from the donor is concerned, as showing any purpose in making the gift.

We may remark, that it is what purports to be a statement of what the party had said nearly two years before the gift was made; the deposition taken November 24, 1881, upwards of nine years after the conversation occurred. In the nature of the thing such testimony has in it elements of inherent weakness—as we all know how difficult it is to repeat language accurately, in a casual conversation, after such lapse of time. We find it almost, if not impossible, to separate our present impressions from what memory actually gives us. In view of this, it is a rule of evidence in our law, that such testimony is the weakest of all testimony deemed competent.

In addition to this, the witness has not told us which is the language of Mr. Johnson in this statement, and which his own. But considering that substantially such a conversation was had, is it sufficient in view of all the other facts shown, to overturn the strong *prima facie* case of complainant made out by presumption of law, when the gift alone is shown, that it was but an advancement?

Under the rule stated by Judge Turney, 9 Heis., 818, for which *Morris* v. *Burroughs*, 3 Atkins, 403, is cited, that "the intention of the donor is to be arrived at from a survey of his conduct and conversation at or about the time of the gift, and the agreement must depend on the circumstances at the time, and cannot be made better or worse by subsequent facts," it is doubtful whether such testimony as

we are now considering is competent at all. It certainly does not accord with the general rule of admissibility on this question, which is "that when the nature of a particular transaction is called in question, a contemporary declaration by the party who does the act is evidence to explain it": *Evans* v. *Jones,* 8 Yer., 463. But conceding it is not too remote, for the sake of the argument, it is still not inconsistent with the idea, that this valuable farm was intended to be given and its profits enjoyed in advance of such a gift to his children, and these advantages might well be a reward for services rendered by a dutiful daughter. This might well have been done, with no intention to express anything on the real question as to whether she should account for the actual value of the farm after his decease. But be this as it may, when we turn to the other facts in the case, any inference drawn from the statement referred to is met by circumstances of more weight, by which its force is negatived and overturned.

The deed of gift was made by the late President Johnson, a man of commanding talents and more than ordinary intelligence. We must assume he would well understand how to make plain his intention in such a gift, if he had any beyond the fact, that he gave the property to his favorite daughter as part of his estate, to be by her enjoyed *in presenti,* with its rents and profits. We can hardly conceive, if he had any purpose beyond this, certainly the purpose she should not be charged with it in the final settlement of his estate—and this the very object of

Johnson *v.* Patterson.

the gift as now maintained—that he should not have said so in the face of the deed, and recited the facts of which witnesses speak, as the consideration moving him thus to discriminate between his children. This would have been done beyond question, if in fact any thing had been said to Jones, the draftsman, on which to base his assumed inference, or the one assumed in argument, that such a gift was intimated by Mr. Johnson, or had his mind been in any way called to such a purpose. Instead of this we have the consideration recited, the real one no doubt, as the love and affection he bore to his daughter, Martha J., precisely the recital that would have been found in a similar deed of gift to either one of his other children, had he given them property and conveyed it at that or any other time.

The donor having himself given in the face of the deed the consideration in his mind at the time when it was made, it ought to require very clear proof, that other considerations than this were the real ones, and they left to be gathered by uncertain inferences from the circumstances of his relation with his daughter, or a casual conversation with a friend. But add to this, what is maintained by respondent, that he made a neat little speech when delivering the deed, and yet the respondent herself cannot call to mind that either then or at any other time he had ever mentioned this additional consideration, or rather only real consideration for the deed, if her contention be correct now, and we can but conclude, that no such purpose then existed, whatever may have been his general purpose

41—VOL. 13.

to reward the special devotion of this daughter in the ultimate disposition of his estate, which is shown to have been considerably over $100,000, a very large one for this country. He could have settled this question at once and forever by using only about the same number of words as he has used, expressing his real intention, that she should not be charged with this gift. Instead of this he has left it open, so far as his own acts are concerned, to the presumption the law makes in such case, which he is assumed to have known to be the result of what he did, as he is conclusively presumed to have known the law of the land. The fact stated by Mrs. Patterson, that he never intimated to her that he intended to charge her for the farm does not meet the point at all. The real question is, did he ever intimate or say, it was not to be done? The act he had done did charge her, unless a contrary purpose is clearly shown.

The only other matter we deem necessary to notice on this question is the fact, assumed to have been proven, that before 1869, a package, containing the deed of Sevier, clerk and master, conveying the land to Mr. Johnson, was seen in his trunk, with the following lines written on it: "This I give to my daughter, Martha, for her kindness and great respect for her father, and I do not wish her interfered with, Andrew Johnson." This inscription fails, however, to make out the case claimed. It was only a declaration of a purpose—or could amount to nothing more—as it could not have been operative as a conveyance. It cannot be made to mean that when

Johnson *v.* Patterson.

given it should not be accounted for. If a man of Mr. Johnson's intelligence had intended this purpose, it would have been perfectly easy to say so, and that in apt and proper words to express his meaning, and the fact he has not done so in the deed together with the other circumstances of the case we have referred to, is totally inconsistent with the existence of such a purpose in his own mind. To hold the contrary would be to assume for Mr. Johnson, either less sagacity and intelligence than his high position and well known ability demands, or that he did not act as any other man of even less intelligence would have acted in giving expression to his purposes. Neither assumption is warranted by anything found in this record, therefore, cannot be assented to as true. The result is this farm must be accounted for at its reasonable value at the time when received.

We now proceed to dispose of the questions presented in argument on the account taken in the case. The broadest question presented, however, is as to the competency of certain witnesses, especially Maloney, whose testimony was, in general terms, excluded by the chancellor on or after the hearing on the first trial, and also on the hearing of exceptions to the last report.

The facts necessary to present the questions made in this case are as follows: Maloney's first deposition was taken and filed May 6, 1881. The case came on to be heard upon "bill, answers and proof," when the bill was dismissed as to Maloney, who had been appointed administrator *de bonis non*, after the death of Andrew Johnson, Jr., who had succeeded his mother.

The decree made by the chancellor on this hearing settled several questions, for instance, held that the Henderson farm was not an advancement, that the pur-chase of the Holston factory was an investment by An-drew Johnson, Jr., Mrs. Stover and Mrs. Patterson, with all the machinery and fixtures attached.    It found that part of the real estate had been divided by agree-ment between the parties, and conveyances executed, but the value not fixed except a certain farm referred to.    It then ordered an account on the basis of the facts found  directing the value of the real estate to be ascertained at date of conveyances.    A general ac-count of the estate against the administrators who had been in charge of it was then ordered on the plead-ings and proof in the record, and such additional proof as parties might offer.

This account embraced the usual elements of ac-count in such cases, assets received, or that ought to have been received;  debts due the estate at death of President Johnson;  what remained due at qualification of present administrator;  what disbursements he had made, etc.;  what assets came, or ought to have come, to the hands of Andrew Johnson, Jr.;  what dis-bursements he had made and if any were lost by neglect.

An account of amounts received by each distributee was ordered, Mrs. Patterson not to be charged with the Henderson farm.   In addition an alternative ac-count was ordered, in which the Henderson farm was to be treated as an advancement, and the Holston factory as personalty purchased to secure a debt, and

standing in the place of the debt, and then it is added the master may report on all special matters he may be requested in writing to report on by either party. Dower was also ordered to be assigned to complainant.

The master made his report to the November term, 1881, when various exceptions were filed, and the case heard on these exceptions by both parties. Nine of the exceptions by complainant were sustained, and the case again referred to the master for "a further and more detailed and complete account of the matters involved." It is then said: "The master will do so as indicated in the exceptions, and as hereinafter directed." It is seen up to this point, the decree adjudges nothing, as the result of his action, and leaves the whole matter open.

It then proceeds, however, on fourth exception, in sustaining it to make an adjudication on the *competency* of Thos. Maloney, defendants' witness, as the decree says: "In certain particulars as fully herein adjudicated," and then recommits said report to the master, as to all the items mentioned in the exception. It is then stated, that the defendants had moved to strike out exception to Maloney's testimony, made by complainant entered on the deposition, which was done because they were to the competency of the testimony, and should be taken at the hearing. Then follows a recital showing what the objections to Maloney's testimony were, that he was attorney at law and confidential legal adviser of Andrew Johnson, Jr., as an individual and as administrator, and he is incompetent to testify as to matters which came

to his knowledge through said relations, and it was so adjudged.) The court being further of opinion that the exception taken to the deposition of Thos. Maloney, as well as orally, on the hearing to the reading of the same as on the deposition, and exhibits thereto "in all such particulars of said depositions which relate to transactions and conversations had with and statements made by Andrew Johnson, Jr., and Andrew Johnson, Sr., and all information which the said Maloney received through his said relation as attorney and legal adviser, and would not have been known but, for said relation, and to such matters as was intended, or entrusted to him, which tend to injure and charge or in any manner decrease the estate of said Andrew Johnson, Jr., is well taken, sustains the objection, and adjudges the said witness as to the matters stated to the extent above stated incompetent, and the same be excluded, and the master in restating the account will not consider them to that extent." It was then decreed that the master's report be confirmed except as modified "and that portion of the same which is based on the incompetent testimony of Maloney, and also M. J. Patterson and Mrs. Stover," as to whom certain exceptions had been taken, after recommitting the report as to the matters referred to, the other part was in *all things confirmed.*

He then gives some eight specific directions as to taking the account, with a general one as to all matters proper for a final settlement.

Exception fourth, on which the ruling was made above cited, is because the master had based his

result, "so far as he had gone, and as far as the same is adverse to the interest of the complainant in the *main*, on the testimony of Maloney, and this is objected to, because the information was obtained while acting as attorney, and in consequence of that relation."

It is seen from this statement that the deposition of Maloney was read on the hearing at first trial, without objection, but had no bearing in the matter now referred to, on any question then adjudged.

On the matters of account then ordered, so far as his testimony was concerned, its bearing was alone to be operative in the future. We think the party to be affected by it, might well take the exception at the time he has done so, that is to say, by exception to the report of the master, to such matter as was alone to be adjudged on the report, and a proper exception would raise the question of the relevancy or admissibility of the matter testified to by a witness; that is, whether the testimony was proper legal proof on which to base a liability on the party then making the objection. If the report was not based on legal and competent proof, it is a proper matter of exception, as this goes directly to the legal correctness of the result reached.

It is seen from this statement, that the exception itself points out no specific matter in the testimony of Maloney as incompetent. The deposition thus excepted to in the exhibits extends from page 274 to 381 inclusive, about 107 pages. It assumes that the main matter of the testimony of the witness is incompetent for the reason given. The decree of the

court only assumes in general terms that such testimony was incompetent in matters tending to charge complainant, "whose knowledge of the facts came through such relations," and to this extent, directed the master to exclude the testimony in restating the account.

The exception then is general to the main testimony of the witness, and the ruling is that so much of the facts as obtained by reason of the relation of attorney should be excluded, but the clerk left to decide what was, and what was not included within the rule. It is settled by all our decisions that a general exception to the competency of the particular witness, does not reach the matter of his testimony, if the witness be in fact competent. Such objection only goes to the individual and not to the matter to which he may depose: Miller v. State, 12 Lea, 225, where the cases in our court are collected by Judge Cooper; so an objection to an entire deposition where part of it is competent, and part not, will not be noticed by this court. The particular matter deemed objectionable must be specified in some particular way, as by the number of the questions and the answers, as the matter stated, and set out in full, so that we can see with reasonable certainty at least, what the objectionable matter is. This ought to be done in a bill of exceptions as being more convenient—but may be done in the decree—still it must have the indicated certainty: See Brandon v. Mullinix, 11 Heis.; Taylor v. Mayhad, 2 Head, 598; 2 Head, 121. The reason and necessity of the rule is

seen in this case.    His Honor, the chancellor, for want of such specification, has merely ruled on abstract questions of law, and left the whole matter open on coming in of the report of the master to see whether he properly applied the rule.    We are left in the same condition, to examine 107 pages of a deposition, to see what part of it was the result of professional confidence and what was not, and that upon a general objection which simply assumes that all which was thus known is incompetent.  We cannot notice this objection for the reasons given.

The objection is one that can readily be made definite, and it should, in this case, have been done, as there is much if not all of the matter that is not within the settled rules of the law on this subject. Our Code, section 4784, (new Code,) has embodied but the common law principle in this language:    "No attorney or counsel shall be permitted, in giving testimony against a client, or person who consulted him professionally, to disclose any communication made to him as attorney by such person, during the pendency of the suit, before or afterwards, to his injury."

This language excludes all communications, and all facts that come to the attorney in the confidence of the relationship.    But there are many transactions between attorney and client, that have no element of confidence in them, of which he is competent to testify. For instance, he may prove his client's handwriting; may prove what money was collected by him, when paid over, and to whom paid:    Weeks on Attorney, 277:  Greenl. vol. 1, sec. 246.

For these reasons the report of the Referees holding the deposition of Maloney in this case should be excluded is disapproved, and the same must be considered as the basis of the account to be taken in the case.

The other exceptions to competency of witnesses need not be discussed, except when they go to the competency of the parties themselves to testify, and we believe there is nothing of any importance involved in this aspect of the case, as Mrs. Stover's testimony, Bessie Johnson's and Mrs. Patterson's were mainly on the question of advancement, and the character of the purchase of the Holston factory. Having settled these questions, it is unimportant to discuss the questions raised as to their personal competency. The result would not be changed either way by the testimony they gave which is as general in these cases as in the one discussed.

This ruling on the testimony of Maloney will necessitate the recasting of a considerable portion of the account. The amount thus involved will be seen from the Referees' report, and the exceptions thereto by the respondents.

We proceed now to dispose of the other minor questions raised by complainant and respondents in their exceptions to Referees' report. First, complainant objects to the valuation of the Henderson farm at $10,000. The proof varies from about $8,000 up to $17,000, the amount paid for it in 1876, by President Johnson. We have examined it, especially the depositions referred to in the exceptions, and think

the master or chancellor has reached about as near the correct result as can be done. It will stand at $10,000. The exception was disallowed, and Andrew, Jr's, estate charged with the Wilhoit debt of $882.61. Taking the proof referred to, we think the Referees' report is correct. Gass' deposition is not shown to have been excepted to on the hearing, and admitted the case is made out and the exception was properly disallowed. It is also objected, that interest was not allowed on the $3,500 compensation allowed Andrew Johnson, Jr., as administrator from date of his death. We think the Referees ruled correctly on this question. The amount of compensation in our practice is properly settled when the account is taken. It does not bear interest by law, and we see no reason why it should be allowed as a matter of discretion in this case.

An exception is taken because complainant's twenty-first exception to the master's report is disallowed, and Mrs. Stover exempted from charge of $782.35 rent of Lowry property. It is very clearly shown by the proof that complainant's intestate, as well as the other distributees, agreed upon a settlement of the divorce suit of Mrs. Stover, then Mrs. Brown, and that this item was then adjudged, together with others involved in a settlement of a debt due from Brown to the estate, and a balance struck as per agreement of parties, by which Mrs. Stover was released from this liability, and $1,040 agreed upon as the proper sum to be charged to her. She is properly charged with this sum. It was a settlement of a matter of interest to the family agreed on by all parties, and ought not now to be

disturbed by any one, much less by the administratrix and personal representative of Andrew, Jr., no fraud or undue means having been used in obtaining the agreement. This exception is disallowed.

The first exception of defendant to be noticed and not disposed of by what has already been said, is that Robinson's testimony was excluded by the chancellor and Referees. This was error, as he did not acquire the information by reason of any confidential relation, nor is the exception so taken or presented in the record, to be noticed.

The next is because the Referees have approved the holding of the chancellor that Mrs. Stover and Mrs. Patterson were not competent, as witnesses, to prove the facts they have deposed to, as to transactions with Andrew Johnson, Sr., on hearing at November term, 1881, and on final hearing in 1884. It is only necessary to say, that the objection is taken to their testimony in the precise form and language and in same decree, as the objection to Maloney's testimony, and for the same reason cannot be noticed so far as the hearing in 1881, is concerned. There is nothing in their testimony, however, bearing on the matters occurring between them and their father in reference to his property in which their testimony was not competent. His estate was not sought to be charged by any claim against him, to be made out by conversation or transactions had between them and him. It is only a contest between his heirs and distributees. Section 3813 *d,* old Code, has no application to such a state of facts as this.

We need not discuss the question as made on hearing in 1881, as the objection is general in the decree without pointing out any matter of the testimony in any way objected to. The witnesses were competent as such, the point of the objection is to the matter of their testimony, and this objectionable matter is not designated. It is only stated that objection was made to the testimony of Mrs. Stover and Patterson, wherein they are of "statements by and transactions with Andrew, Jr." This points out and defines nothing, and cannot be noticed in this court. The next as to Maloney's testimony and his wife's is disposed of in the same way—it simply a personal objection to competency, and points out no objectionable matter deposed to. The sixth has already been disposed of as to the Holston factory.

Exception seventh is to a reported overcharge of interest from December 21, 1877. This exception is well taken, as the report shows that while Andrew, Jr., is charged with this sum as received in December, 1877, and did not in fact receive it until April after, yet he is credited with the same as paid out on same day and interest computed from that time; and so the result is the same in the end.

Eighth exception is to alleged errors in interest on two items. The exception, however, is too general to be noticed, even if well taken. It is that the record shows the report of the master is correct, and certain pages of the record cited—but in what the error consists we are not shown by the exception. This exception is overruled.

Johnson *v.* Patterson.

Ninth exception is to item $1,261, and was disallowed by Referees because supported by Maloney's deposition. This was error under what we have said in former part of this opinion; besides, the vouchers are presented for it, and these were not incompetent to be proven by Maloney in any aspect of the case. This exception to report of the Referees is sustained.

The tenth exception is admitted to be immaterial as it is only to the summing up of the report.

The eleventh exception is because the Referees report that the counsel fees of present administrator should not be allowed—they are to R. M. Barton $234.50, and J. H. Robinson $250, and paid for services in this cause. We see no good reason why they should not be allowed, a settlement of the estate was necessary to be had. The present administrator certainly was in no default. Had not been in office six months when this suit was commenced, and counsel was absolutely necessary to aid in its management. He was not bound to employ such counsel at his own expense, at any rate is entitled to be reimbursed for his proper expenditures under the facts in this case

The next exception is to the allowance of $3,500 for services of Andrew Johnson, Jr., as administrator. There is a good deal urged as to his want of capacity to manage the business, and that Mr. Maloney, his counsel, did most of the business. But after careful consideration, we do not see any reason to change this allowance. There seems to have been no mismanagement, and if the large amount, over $100,000, was well managed during the three years, or about that,

while he controlled it, by the aid of efficient counsel, we see no reason in this to cut down the compensation, which is certainly very reasonable.

The thirteenth exception is because Referees refuse to charge Andrew, Jr., with some checks, given in his favor by his father on a Knoxville bank. The checks are shown, signed by Andrew Johnson, by Andrew Johnson, Jr., and were paid to Andrew, Jr., by the bank. These checks are two of them for $100 each and two for $50. We cannot say, that these checks were or ought to be charged as advancement. We do not see any evidence that such was the case. The probability is, that they were sums given by the father to the son, but may have been for other purposes. It would have been a violent presumption to say, that small sums given by a wealthy father to a son were intended to be charged against the son.

Fourteenth, because Referees have refused to allow items of $50 and $700, because not made out of the proof. The $50 is shown to have been received by vouchers attached to Maloney's deposition, a receipt for registered letter was disallowed because thus proven. It should be charged to Andrew, Jr.

As to the $700 the exception is simply, that the Referees have reported that the exception of respondents to this item should be disallowed, because it is alleged that the proof to sustain them is insufficient. This is a proper charge, says the exception, and the Referees should have so reported. This is disallowed because supported by testimony of Maloney. It is within the principle we have announced of competency

of Maloney, even if the objection had been specifically made. It was proof of money paid over by the attorney, and he was competent in any aspect to prove this. It was in no sense a confidential communication. This item is a proper charge against Andrew, Jr., and the exception is well taken to Referees' report. The same principle applies to the items and the fifteenth exception, which are sustained by additional testimony showing money sent by registered letters or postoffice receipts and express receipts. This exception to report is sustained.

Sixteenth exception is that A. J. Patterson is charged with rents of Holston cotton factory. This exception must be sustained. The administration as such has nothing to do with real estate, unless needed to pay debts, and cannot be held officially responsible in a case like the present. Besides it shows he was in possession only as agent of owners, Mrs. Stover and Patterson, and not as administrator.

Seventeenth exception is because of allowance of interest against Patterson on amount of money shown to have been in his hands by clerk's report. We concur with Referees that this is a proper charge. From his own testimony we think he has used this money, as he does not pretend that he has kept it separate from his own funds, only that he has always had money on hands to settle. He could have relieved himself by paying it into court.

The eighteenth exception is for failure to report, that A. Johnson, Jr., should be charged with $10,000 in bonds, whereas he is charged $9,450. We think

the parties received the bonds at face value. The others did so, and so the matter was settled, and should stand at that sum.     Exception allowed.

Nineteenth exception is as to value of hotel property fixed by master's report at $3,500, raised to $4,000 by chancellor.     We think the master's report is sustained by the proof, and that sum will be charged.

The next and last question is, as to the charging interest on advancements. This is raised as to the Henderson farm mainly, if not entirely, in the argument.

It is settled by all authority, we believe, that interest is not to be charged before the death of the testator or intestate: See Wait's Act. & Def., vol. 1, 212, and authorities cited.

The chancellor charged no interest whatever in his decree. The Referees report that interest should be charged on advancements made in the lifetime of intestate from time of his death. It was so laid down as a *dictum* in the case of *Burton* v. *Dickinson*, 3 Yer., 112, and approved in editor's note, p. 122. It was so decided as the general rule in the case of *McNairy* v. *McNairy*, Nashville, December term, 1874, after much consideration in an able opinion by Judge McFarland.

We think this, as a general rule, is correct, as then held, and the Referees have correctly reported on this question. It will, in most cases, produce the desired end, as said in that opinion; there may be cases where it might not reach equality, the leading object of our law in such cases, and then it could be so applied as to produce that result.     In this case

42—VOL. 13.

it will work no injustice, as far as we can see, and if the advancement is not charged with interest from the death of the ancestor, then the party will be getting that much more than an equal share of the estate. She will have to account for it, and have it charged against her, at its value when received, and starting from the death of Andrew Johnson, interest will be calculated on the ascertained value as fixed in this opinion.

The questions raised on certain pleas in abatement were waived and abandoned by counsel on the argument, and need not be considered. A decree can be drawn in accord with this opinion. Costs will be paid out of the funds of the estate.