# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
July 18, 2001 Session

## STATE OF TENNESSEE v. TRACY F. LEONARD

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 40494     Robert W. Wedemeyer, Judge**

---

### No. M2001-00368-CCA-R3-CD - Filed August 28, 2002

---

The defendant, Tracy Frank Leonard, was convicted of first degree premeditated murder, felony murder, two counts of especially aggravated kidnapping, rape, and theft over $1,000.  The trial court merged the convictions for first degree premeditated murder and felony murder and also merged the convictions for especially aggravated kidnapping into a single conviction.  The defendant received a life sentence for the first degree murder, twenty-five years for especially aggravated kidnapping, eight years for rape, and two years for theft over $1,000.  The trial court ordered that the sentences for especially aggravated kidnapping and rape be served consecutively to the life sentence and consecutively to each other.  The sentence for the theft is to be served concurrent with the sentence for rape.  The effective sentence is, therefore, life plus thirty-three years.  In this appeal as of right, the defendant alleges (1) that the trial court erred by admitting the testimony of several witnesses; (2) that the evidence is insufficient to support his convictions for especially aggravated kidnapping and rape; (3) that the trial court erred by restricting his right to cross-examination of witnesses; (4) that the trial court erred by failing to grant a new trial based on the State's failure to disclose exculpatory evidence; (5) that the trial court erred by failing to grant a mistrial; (6) that the trial erred in its instructions to the jury; (7) that the trial court misapplied certain enhancement factors to his sentences for especially aggravated kidnapping and rape; and (8) that the cumulative effect of the trial court's errors denied him the right to a fair trial.[1]  We affirm the convictions and judgments for first degree murder, especially aggravated kidnapping where the victim suffers serious bodily injury, rape, and theft over $1,000.  We conclude the sentences imposed were proper.  The defendant's conviction for especially aggravated kidnapping accomplished by the use of a deadly weapon is reversed and remanded for a new trial because of the trial court's failure to instruct the jury as to lesser-included offenses.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed in Part; Reversed and Remanded in Part**

---

[1] Because of the relationship between the issues, we choose to address them in an order different from that in which they were presented in the briefs.

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, J., joined. GARY R. WADE, P.J., not participating.

Carrie Kersh, Clarksville, Tennessee, for the appellant, Tracy F. Leonard.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and C. Daniel Broiller, Jr., Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

On November 19, 1996, Crystal Jarrett, who was working at the Econo Lodge motel located at 201 Holiday Road in Clarksville, observed the victim, Cherilyn Leonard, enter the motel lobby at approximately 8:30 a.m. and sit in a chair. Seconds later, the defendant entered the lobby and sat next to the victim. Shortly thereafter, the victim approached the front desk and asked whether there was a pay telephone in the motel. Ms. Jarrett informed the victim that there was no pay telephone, but permitted her to use the house telephone located near the public restrooms. The victim walked toward the phone and the defendant "followed right on her tail." According to Ms. Jarrett, the defendant "stood about eight inches" from the victim as she made a telephone call. Ms. Jarrett recalled that "the phone slammed on the hook" and the defendant then dragged the victim out of the lobby. While being pulled from the lobby area, the victim remarked to Ms. Jarrett that she and the defendant "would be checking out," giving her room number as 211. The victim added that Ms. Jarrett "could call the police now." After the victim and defendant exited the lobby, Ms. Jarrett heard a woman shouting. Before Ms. Jarrett could telephone the police, she heard a gunshot. According to Ms. Jarrett, the victim ran into the motel vestibule then "her arm hit the glass door and she fell backward against the bookcase and then [the defendant] was right there on her and then he shot her." Ms. Jarrett heard the victim scream once. Ms. Jarrett conceded that she did not observe the first gunshot, but had watched as the defendant "hovered over" the victim. Ms. Jarrett testified that after the defendant shot the victim, he looked at her "very angry." His expression then turned to one of fear and he ran out the door.

Jerry Tams, a resident of Florida who was staying at the Econo Lodge on the morning of the shooting, stated that he was preparing to leave the motel when he heard "a little bit of noise" coming from the lobby. When he turned to look, he saw "a gentleman with his arms around a girl." Mr. Tams overheard the girl say "something to the effect of oh, no please stop" before the couple fell to the ground. Mr. Tams recalled the subsequent events as follows:

> She broke his hold. He was able to get his left knee on her and hold her down with his left hand and as that was going on, she was still screaming, please stop, please stop, or something like that. And I saw him reach into his right pocket and pull out a black semi-automatic weapon and shoot her with it. . . . As he got the weapon out of his pocket, he chambered the bullet into the barrel and held the gun down and

-2-

pulled the trigger once. I believe he tried to pull the trigger again and [the gun] misfired because he rechambered another bullet.

After Mr. Tams saw the victim run into the lobby followed by the defendant, he heard more gunshots from inside the lobby. Fearful for his family, Mr. Tams hurried his wife and son into their camper. Shortly thereafter, the defendant exited the motel, looked around, and walked very quickly away from the motel. Mr. Tams recalled that, prior to the shooting, he had seen the victim and the defendant sitting together in the motel lobby. He testified that the victim was "smiling and laughing." Deborah Jean Tams provided essentially the same account as her husband Jerry. She added that the defendant appeared angry, but not nervous, during the incident.

Clarksville Police Officer John Douglas testified that he was parked at a Texaco Station approximately one hundred yards away from the motel when he received a report of the shooting. Upon arriving at the motel, he checked its perimeter to determine if the defendant was still on the premises but discovered no one.

Officer Timothy Saunders, who was working for the Clarksville Police Department, participated in a search of room 211. No personal property belonging to either the defendant or the victim was found during the search.

Luigi Agostini, a United States Army Criminal Investigation Agent, testified that the defendant surrendered to authorities at Fort Campbell two days after the shooting. According to Agostini, the defendant "looked like he had been out for quite a while, he was dirty and he was also injured." At the time of his surrender, the defendant was driving a red Honda automobile. A search of the vehicle yielded a Glock .45 caliber handgun, two plastic bags containing .45 caliber ammunition, and seven magazines loaded with .45 caliber ammunition in the front passenger seat. Additionally, the vehicle contained camping gear, fishing line and hooks, plastic flex-type handcuffs, a roll of duct tape, eleven condoms, and a jar of Vaseline.

Detective Robert Miller of the Clarksville Police Department was in charge of the investigation into the victim's death. During his investigation, he learned from Merlyn Moore, who worked as a desk clerk at the Econo Lodge on the night before the shooting, that the defendant was alone when he checked into room 211 at 9:38 p.m. The address listed on the registration card for room 211 was the defendant's home address. The vehicle was described on the card as a "pinkish colored" Honda Prelude. Miller later determined that the title registration of the vehicle was in the name of Roderick Smith, the defendant's roommate.

Dr. Joseph Eugene Dyer, a forensic pathologist at Blanchfield Army Community Hospital, testified that the victim sustained three gunshot wounds to the chest and one gunshot wound to the arm. He explained that, while all three wounds to the chest were potentially fatal, two of the wounds would have caused immediate death. Dr. Dyer stated that because he was not provided with the clothing that the victim was wearing at the time of the shooting, he was unable to determine the distance from which the shots were fired. He noted, however, that the presence of soot, stippling,

and an area of scorch on the victim's forearm indicated that one shot was fired from a distance of less than one foot. Dr. Dyer testified that a sexual assault examination was performed on the victim and specimens obtained during the examination were given to the Clarksville Police Department. Testing later revealed the presence of sperm in the victim's vaginal and anal cavities that had been deposited only six to ten hours prior to the victim's death. On cross-examination, Dr. Dyer related that there were no physical signs of restraint, such as ligature marks, on the victim's body. Additionally, he testified that the presence of "necrotic decidua"[2] in the victim's uterus was consistent with the victim having had an abortion one and one- half months prior to her death in November of 1996. Other evidence established that the victim had an abortion in October of that year.

Agent Samera Zavara of the TBI obtained DNA profiles from samples of the victim's blood, the defendant's blood, and the specimens taken from the sexual assault examination. She concluded that the DNA profile of the sperm present in the victim's vagina and anus was consistent with that of the defendant. Agent Zamara testified that "in the Caucasian population, approximately one in six thousand two hundred individuals that are unrelated would have this combination, this DNA profile."

Attorney Christine Zellar-Church represented the victim in her divorce from the defendant in the summer of 1996. Ms. Zellar-Church testified that the victim told her that domestic violence "had been a problem between her and the defendant for some time." Ms. Zellar-Church recalled that they had discussed the possibility of obtaining an order of protection but the victim related that she had moved to a different town and no longer felt threatened by the defendant. The marital dissolution agreement entered into by the parties provided that the defendant "would not interfere with [the victim] and her new life, that he would leave her alone." The divorce became final in July of 1996.

Larry E. Reeb, the defendant's commanding officer at Fort Campbell, recalled that the defendant, who was trained as a Special Forces soldier, purchased a gun in November of 1996. Reeb also recalled that the defendant told him he was experiencing financial difficulties.

Nancy Leonard testified that she was married to the defendant twice. According to Ms. Leonard, the couple met and married in 1990 while serving in the military. While on duty in North Carolina, the defendant became romantically involved with the victim. He divorced Ms. Leonard shortly before the birth of their second child and married the victim. While married to the victim, the defendant rekindled his romance with Ms. Leonard. After divorcing the victim, the defendant remarried Ms. Leonard. After she was sent to North Carolina for training, Ms. Leonard returned home to Clarksville on a weekend pass and discovered the defendant and victim in a compromising position. Shortly thereafter, the defendant divorced Ms. Leonard and remarried the victim. Ms.

---

[2]Dr. Dyer explained that decidua is found in the uterus during pregnancy and forms the bed upon which a placenta rests.

Leonard testified that the victim did not like the defendant's children from his first marriage and considered them a burden on her relationship with the defendant.

Ms. Leonard recalled that three months before the shooting, the defendant told her that the victim had ruined his life and destroyed him financially. Additionally, he admitted that he "had tied [the victim] up and tortured her for hours in March of that year." The defendant informed Ms. Leonard that "he had to finish it." Ms. Leonard stated that the victim, who confirmed the March incident, was not surprised when Ms. Leonard told her of the defendant's statements. The victim remarked to Ms. Leonard that she was protected by the "guidelines" of her divorce agreement. When Ms. Leonard spoke with the victim in October of 1996, the victim expressed her belief that the defendant would kill her.

Steven Hinson, who worked with the victim, testified that in March of 1996, about eight months before the shooting, the victim arrived at his apartment unannounced and claimed that she had been raped by the defendant. The victim showed him rope burns on her wrists and legs and, because of her fear of the defendant, asked to stay at Hinson's apartment. The victim refused to report the incident to police.

Angela Murphy, a friend of the victim, testified that during the summer before the shooting, the victim often commented that she no longer cared for the defendant and wanted the marriage to end. The victim informed Ms. Murphy that the defendant had hurt her in May of 1996 and that she was going to leave him. The victim also told Ms. Murphy that she would file a restraining order against the defendant if he ever hurt her again. Ms. Murphy testified that she helped the victim leave the defendant.

George Elliot Matthews, a co-worker, testified that he began dating the victim approximately three weeks before her murder. He stated that he last spoke with her on the night before the shooting shortly before she was scheduled to begin her shift at 8:30 p.m. He telephoned her apartment at approximately 8:00 p.m., got no answer, and left a message on her answering machine. The victim returned the phone call approximately five minutes later, explaining that she had been drying her hair and indicating that she would report to work as scheduled. According to Matthews, the victim had told him that "it would suit her perfectly fine if she never had any dealings with [the defendant] again."

Jerry White, the victim's supervisor at the Postal Service, testified that she was given several warnings because of excessive absences from work. White recalled that the victim was eventually suspended for seven days due to the unexcused absences. The victim blamed her absences on personal problems, claiming that she feared the defendant and believed that he had been following her.

Patricia Brantley, a friend of the defendant, testified that on the day before the shooting, the defendant asked to borrow her vehicle, a red Honda Civic, explaining he needed to run errands and needed a vehicle bigger than the Honda Prelude which belonged to his roommate. Ms. Brantley,

who worked at a McDonald's restaurant, loaned her car only after the defendant agreed to return the vehicle before her shift ended at 2:00 a.m. the next morning. The defendant never returned the vehicle, which was valued at approximately $3,500.00. This testimony provided the basis for the theft conviction.

Merlyn Moore, who was working as a desk clerk at the Econo Lodge on the evening before the shooting, testified that the defendant checked into the motel at 9:38 p.m. Moore recalled that the defendant appeared to be in a hurry.

LaQuita Denise Stagner[3], the victim's neighbor, testified that she observed the victim fighting with a man in the parking lot outside of her apartment at approximately 8:00 p.m. the night before the shooting. Although unable to hear their conversation, Ms. Stagner recalled that the two argued loudly and were involved in physical contact. Ms. Stagner stated that during the argument, the victim remained seated in the driver's side of her Jeep with the door open and the man stood "in the door." According to Ms. Stagner, the man "move[d] [the victim] over into the passenger side" before he entered the Jeep and sat in the driver's seat. Ms. Stagner recalled that she left for work and when she returned to her apartment at approximately 10:00 p.m., the Jeep was parked on the opposite side of the parking lot from the victim's usual parking space.

Tia Ayers, who worked with the victim, received a telephone call from the victim on the morning of the shooting. The victim asked Ms. Ayers to feed her cat, explaining that she was with the defendant, who had kidnapped her. She then told Ms. Ayers to call the police. The telephone went dead as Ms. Ayers asked the victim questions in an attempt to ascertain her whereabouts. Ms. Ayers immediately informed Metro Police that the victim had been kidnapped and that she was unaware of the victim's location. After she spoke with police, Ms. Ayers dialed "*69" and learned that the victim had called from the Econo Lodge in Clarksville. Ms. Ayers testified that in the months prior to the shooting, the victim had confided to her that she believed the defendant was stalking her and expressed her desire to be left alone. Ms. Ayers acknowledged that the victim had met with the defendant on previous occasions since their divorce, but explained that the victim had instructed Ms. Ayers to call her house to check on her well-being one hour after any meeting the victim had with the defendant. According to Ms. Ayers, the victim said she should call the police if she was not home an hour after meeting with the defendant.

Detective Cheryl Anderson of the Metro Police Department visited the victim's apartment on the morning of the murder and observed no evidence that a struggle had occurred inside the apartment.

The defendant, who testified in his own behalf, met the victim while deployed in North Carolina in the early spring or summer of 1992. While still married to Nancy Leonard, the defendant became romantically involved with the victim. Soon after the defendant returned to Fort Campbell

---

[3]At the time of the shooting, the witness' name was LaQuita Denise Slate. At the time of trial, however, the witness testified that her surname changed to Stagner in November of 1998.

to be with his wife and children, the victim began calling his home. The defendant then obtained a divorce from Nancy Leonard and married the victim. Later, the defendant rekindled his relationship with his first wife, after which the victim volunteered to go to Somalia as part of her military duty. When she returned from Somalia, the defendant divorced the victim and remarried Nancy Leonard. During his second marriage to Nancy Leonard, the defendant again became romantically involved with the victim. A divorce ensued, and the defendant began living with the victim in her apartment. The victim ultimately moved into the defendant's residence and they were remarried in December of 1995. The defendant denied having attacked the victim in March 1996, claiming that he was in Fort Bragg, North Carolina, where he had been sent for language training. Telephone records established that telephone calls were made from the defendant's residence in Clarksville to Fort Bragg on March 22, 24, 25, and 27, and calls were made on the defendant's calling card from Fort Bragg to his home on March 21, 24, 25, 26, 27, 28, and 31. In May of 1996, the victim left the defendant and moved to Antioch where she filed for divorce. According to the defendant, the victim continued to meet with him after she moved and they would "usually go to a restaurant and go to a motel afterwards."

The defendant testified that he purchased a .45 caliber gun in November of 1996 from a man in Columbia, Tennessee in order to be better prepared for Special Forces qualification. The weapon was registered "on post at the gate four MP Station." The defendant claimed that he planned to go on leave on November 19, 1996 to take a canoe trip. Because his plans were uncertain, however, he also prepared to work on November 19. The defendant borrowed Samuel Kamacho's Mitsubishi truck on November 18 and returned it the same day. Later, he borrowed Patricia Brantley's Honda Civic vehicle because he was meeting the victim that evening and she would not ride in his roommate's "pink, low-rider, Honda Prelude."

According to the defendant, when he arrived at the victim's apartment, the victim initially insisted on driving her Jeep, but they eventually left in Ms. Brantley's Honda Civic. The defendant claimed that the victim asked to go to a motel. While the defendant checked into the Econo Lodge in Clarksville, the victim remained in the vehicle. After securing a room, the defendant and the victim talked and watched television before having sexual intercourse. The defendant testified that during the evening, the victim expressed her continued love for him.

According to the defendant, on the next morning, the victim told him that she was worried about getting pregnant and informed him that she had been pregnant before. After the defendant asked what she meant, the victim "smirked" and walked out of the room. He persisted in his inquiry as they walked across the parking lot and, according to the defendant, the victim ignored him. At that point, the defendant retrieved his gun from his ruck sack,[4] which was in the vehicle they had driven to the motel. The defendant found the victim in the lobby sitting on a couch. According to the defendant, the victim continued to smirk when he asked her questions about the previous pregnancy. Eventually, the victim admitted that she had been pregnant recently and that she did not know who fathered the baby. The victim then walked to the front desk and asked the clerk about a

_____

[4] This is a slang term for an army issued back pack.

phone. When she walked to the house telephone, the defendant followed, still questioning her about the pregnancy. He admitted that he hung up the phone and, when the victim attempted to walk away, grabbed her. The defendant claimed that after they went outside, "everything happened real fast." According to the defendant, they fell to the ground, and he shot her. While admitting responsibility for the shooting, the defendant claimed that he had not planned to kill the victim. The defendant testified that after shooting the victim, he drove to Kentucky and stayed for approximately two and one-half days before calling his mother to make arrangements to surrender to authorities. Later, the defendant surrendered to authorities at Fort Campbell.

## I.

The defendant alleges numerous procedural and evidentiary errors in the admission of the testimony of several witnesses. Specifically, the defendant asserts that the victim's divorce attorney, Christine Zellar-Church, was permitted to testify in violation of the attorney-client privilege; that several witnesses were allowed to testify about his prior bad acts in violation of Tennessee Rule of Evidence 404(b); and that testimony offered by Nancy Leonard and the victim's co-workers and friends was inadmissible hearsay.

Testimony offered by Christine Zellar-Church indicated that the victim feared the defendant, did not want to have a relationship with him, and would not have gone to the motel with the defendant voluntarily. Citing Swidler & Berlin v. United States, 524 U.S. 399 (1998), the defendant argues that the trial court erred by allowing Ms. Zellar-Church to testify about conversations she had with the victim during the pendency of her divorce. The trial court found that the defendant lacked standing to assert the attorney-client privilege on behalf of the victim and also ruled that the privilege had been waived by the victim's mother, who served as the executrix of the victim's estate.

By statute and common law, Tennessee recognizes an evidentiary privilege by which an attorney may not disclose confidential client communications. See Bryan v. State, 848 S.W.2d 72, 79 (Tenn. Crim. App. 1992). Tennessee Code Annotated section 23-3-105 provides:

> No attorney, solicitor or counselor shall be permitted, in giving testimony against a client, or person who consulted the attorney, solicitor or counselor professionally, to disclose any communication made to the attorney, solicitor or counselor as such by such person, during the pendency of the suit, before or afterwards, to the person's injury.

In Bryan, a panel of this Court confirmed that the purpose of the privilege is to shelter client confidences and thus protect both the client and a relationship which is a mainstay of our system of justice and quoted the following from McMannus v. State, 39 Tenn. 213, 215-16 (1858):

"Sound public policy seems to have required the establishment of the rule that facts communicated by a client to his counsel are under the seal of confidence, and cannot be disclosed in proof. It is a rule of protection to the client, more than a privilege to the attorney. The latter is not allowed, if he would, to break this [s]eal of secrecy and confidence. It is supposed to be necessary to the administration of justice, and the prosecution and defence of rights, that the communications between client and their attorneys should be free and unembarrassed by any apprehensions of disclosure, or betrayal. The object of the rule is, that the professional intercourse between attorney and client should be protected by profound secrecy."

848 S.W.2d at 79.

Because of public policy and judicial administration concerns, several exceptions to the privilege have been fashioned, demonstrating that the privilege is not absolute. See generally Hazlett v. Bryant, 241 S.W.2d 121, 123 (Tenn. 1951); Bryan, 848 S.W.2d at 79. Because the privilege is not absolute, four factors must be established before it can be applied:

1. The asserted holder of the privilege is or sought to become a client;
2. The person to whom the communication was made is a member of the bar of a court, or his subordinate and in connection with this communication is acting as a lawyer;
3. The communication relates to a fact of which the attorney was informed by his client without the presence of strangers for the purpose of securing primarily either an opinion on law or legal services or assistance in some legal proceeding and not for the purpose of committing a crime or tort; and
4. The privilege has been claimed and not waived by the client.

See Royal Surplus Lines Ins. Co. v. Sofamor Danek Group, 190 F.R.D. 463, 468-69 (W.D. Tenn. 1998) (quoting Humphreys, Hutcheson & Mosley v. Donovan, 568 F. Supp. 161, 175 (M.D. Tenn. 1983) (construing Tennessee statute)); see also Johnson v. Patterson, 81 Tenn. 626, 649 (1884). In the present case, the first three requirements are easily met. The existence of the fourth factor, however, is less certain because the victim's death prevents her from either waiving or claiming the privilege.

In Swidler & Berlin, the Supreme Court, finding that the purposes underlying the attorney-client privilege endure after the death of the client, held that the privilege survives even after the client's death. 524 U.S. at 405-06. The Court concluded that "[k]nowing communications will remain confidential even after death encourages the client to communicate fully and frankly with counsel." Id. at 407. Finally, the court opined that "[w]ithout assurance of the privilege's posthumous application, the client may very well not have made disclosures to his attorney at all, so the loss of evidence [associated with application of the privilege] is more apparent than real." Id. at 408.

Here, the trial court permitted the victim's mother, who was serving as the executrix of her estate, to waive the privilege on the victim's behalf. Although an issue of first impression in Tennessee, other jurisdictions have adopted the common law provision that the attorney-client privilege may be waived by the client, his guardian or conservator, the personal representative of the deceased client, or the successor, trustee, or similar representative of a corporation, association or other organization whether or not in existence. See generally E. S. Stephens, Annotation, Attorney Client Privilege–Waiver, 67 A.L.R.2d 1268, 1269 (1959). "After the death of a client, the privilege protecting communications between him and his attorney may be waived, under certain circumstances, by the executor . . . of the client's estate, especially when the waiver benefits the client, his estate, or persons claiming under him, and does not damage his reputation." Id. at 1271. Those jurisdictions adopting this provision, however, have done so in the limited circumstances involving the recovery of real property and will contests. See, e.g., In re Estate of Curtis, 394 P.2d 59 (Kan. 1964); Scott v. Grinnell, 161 A.2d 179 (N.H. 1960); Norfolk Dist. v. Magraw, 628 N.E.2d 24 (Mass. 1994); Taylor v. Sheldon, 173 N.E.2d 892 (Ohio 1961).

It is not necessary in this case, however, to determine whether the executor of an estate may waive the attorney-client privilege on behalf of the decedent for the purposes of prosecuting the accused killer. As indicated, the attorney-client privilege exists to protect the client and to foster full communication with the attorney. Because the privilege exists to protect the client, it belongs only to the client and thus may not be asserted by a third party. Consequently, the trial court properly found that the defendant lacked standing to assert the privilege to bar Ms. Zellar-Church's testimony. This issue is without merit.

The defendant also challenges the admissibility of (1) the testimony of Steven Hinson, Angela Murphy, and Nancy Leonard concerning the defendant's March 1996 attack on the victim; (2) the testimony of Jerry White that the victim believed the defendant was following her; (3) the testimony of Ms. Zellar-Church that the victim indicated that she was a victim of domestic violence during her marriage to the defendant; and (4) the testimony of Scott Peelman and Charles Palmer that the defendant told them he was taking leave to attend to legal matters in Illinois. He argues that because the testimony of these witnesses related to his prior bad acts, it was inadmissible under Tennessee Rule of Evidence 404(b). Generally, the admissibility of evidence under Rule 404(b) is within the discretion of the trial court. See State v. Dubose, 953 S.W.2d 649, 652 (Tenn. 1997).

Usually, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Rule 404(b) provides as follows:

  (b) Other Crimes, Wrongs, or Acts. Evidence of other crimes wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
  (1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and

(3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

The general rule excluding evidence of other crimes is based on the recognition that such evidence invites the jury to improperly convict the defendant based upon his bad character or apparent propensity to commit a crime, regardless of the strength of the evidence concerning the offense on trial. State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994); see also Anderson v. State, 56 S.W.2d 731 (Tenn. 1933). Unlike the Federal rule barring such evidence, our rule does not specifically enumerate the purposes for which such evidence may be offered. State v. Gilliland, 22 S.W.3d 266, 271 (Tenn. 2000). The Advisory Commission specifically omitted such a list so that lawyers and judges would "'use care in identifying the issues to be addressed by the Rule 404(b) evidence.'" Gilliland, 22 S.W.3d at 271 (quoting Neil P. Cohen et al., *Tennessee Law of Evidence* § 404.6, at 169 n.457 [3d ed.] 1995)). Therefore, in every case in which evidence of other crimes, wrongs, or acts is offered, the trial court should carefully scrutinize the relevance of the evidence and the reasons for which it is being offered. Gilliland, 22 S.W.3d at 271. Although Rule 404(b) does not explicitly list these exceptions, case law has held that evidence of other crimes may be admissible to show (1) motive; (2) intent; (3) guilty knowledge; (4) identity of the defendant; (5) absence of mistake; or (6) a common scheme or plan for commission of two or more crimes so related to each other that proof of one tends to establish the other. See, e.g., Collard v. State, 526 S.W.2d 112, 114 (Tenn. 1975); see also Neil P. Cohen et al., *Tennessee Law of Evidence* at § 404.6.

In this case, Steven Hinson, Angela Murphy, and Nancy Leonard testified that the defendant raped the victim in March of 1996. Hinson testified that the victim had shown him rope burns and claimed that she received them when the defendant bound her before raping her. Ms. Leonard testified that the defendant admitted attacking the victim and that the victim confirmed the truthfulness of the defendant's admission. Ms. Murphy stated that the victim told her that she was raped by the defendant. Ms. Zellar-Church testified that the victim admitted having been a victim of domestic violence during her marriage to the defendant. The defendant claimed that he and the victim continued their relationship even after their divorce in July of 1996.

In State v. Smith, our supreme court held that evidence of the defendant's prior assaults against the victim were admissible because such acts were relevant to establish the relationship between the parties, thus providing a motive for the killings, and that their probative value was not outweighed by the danger of unfair prejudice. 868 S.W.2d 561, 574 (Tenn. 1993); see also State v. Hall, 958 S.W.2d 679, 708 (Tenn. 1997). While we acknowledge that Smith did not create a *per se* rule of admissibility regarding prior bad acts against the victim, in our view the trial court properly found that the testimony relating to prior domestic violence toward the victim and the March 1996 attack on the victim was relevant to establish the relationship between the parties, the defendant's

hostility toward the victim, and his motive to kill the victim. Further, it is our view that the probative value of this testimony is not outweighed by the danger of unfair prejudice. Under these circumstances, the trial court did not abuse its discretion in admitting such evidence.

The defendant also argues that there is not clear and convincing evidence that the defendant committed the prior acts of violence against the victim, as required for admission. See Tenn. R. Evid. 404(b), Advisory Comm'n Comment; Hall, 958 S.W.2d at 708; State v. Parton, 694 S.W.2d 299, 303 (Tenn. 1985). Here, several witnesses testified that the victim related the story of the March 1996 attack while expressing her fear of the defendant. The defendant admitted the earlier attack to Nancy Leonard and, when Ms. Leonard telephoned the victim to warn her of the defendant's animosity, the victim confirmed the defendant's version of events. Moreover, Steven Hinson testified that he had seen the rope burns on the victim's wrists and ankles when she came to his apartment seeking refuge. In our view, the State established by clear and convincing evidence that the defendant had attacked the victim in March of 1996.

With regard to the testimony of Peelman and Palmer, we cannot quarrel much with the trial court's finding that the testimony regarding the defendant needing leave to attend to a court or legal matter did not necessarily implicate a prior bad act. See, e.g., State v. James Willis, No. 03C01-9412-CR-00444 (Tenn. Crim. App. at Knoxville, May 15, 1996), perm. to appeal denied, (Tenn. at Knoxville, Nov. 12, 1996) (testimony that defendant, charged with shoplifting, had been in store before, followed by testimony that security cameras were turned on when he entered this time, did not implicate a prior bad act). In any event, we see no prejudice arising from their testimony.

The defendant also contends that the testimony regarding the March 1996 attack and the victim's fear of the defendant offered by Ms. Leonard and the victim's friends and co-workers constituted inadmissible hearsay. Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Tenn. R. Evid. 801(c). Generally, hearsay is not admissible; numerous exceptions exist, however, to this general rule. See Tenn. R. Evid. 802. Here, the State asserts that the testimony is admissible under Tennessee Rule of Evidence Rule 803(3), which allows admission of testimony indicating the declarant's "then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)." The victim's fear of the defendant may be admitted under this exception if relevant to a fact at issue in the case. See State v. Leming, 3 S.W.3d 7, 18 (Tenn. Crim. App. 1998); State v. John Parker Roe, No. 02C01-9702-CR-00054 (Tenn. Crim. App. at Jackson, Jan. 12, 1998), perm. to appeal denied, (Tenn. at Jackson, Jan. 4, 1999).

At trial, a primary issue was whether the victim accompanied the defendant voluntarily or was abducted against her will. The defendant claimed that he had maintained a romantic relationship with the victim after their divorce and denied abducting her against her will or planning to kill her. Our supreme court has held that statements made by a victim expressing her fear of the defendant during the period of their separation could be admitted to rebut the defendant's assertions that he and the victim were reconciling. See Smith, 868 S.W.2d at 573. Similarly, this Court has stated that a

victim's statement that her husband had abused her and threatened to kill her were admissible to rebut the defendant's assertion that he and the victim "had a good marriage and a happy marriage." See Roe, slip op. at 18-21. Here, testimony offered by several witnesses that the victim had expressed her fear of the defendant and her desire to be free of him was admissible to rebut the defendant's assertion that he and the victim continued an amorous relationship after their divorce and that the victim voluntarily accompanied the defendant to the motel.

The trial court permitted Ms. Leonard to testify that the defendant told her that he felt like the victim had ruined his life financially in the divorce and that he had previously bound and raped the victim. The trial court correctly found such testimony admissible under the "state of mind" exception to the hearsay rule. See Tenn. R. Evid. 803(3); Neil P. Cohen et al., *Tennessee Law of Evidence* § 803(3). This testimony demonstrates the defendant's animosity toward the victim and his settled purpose to harm her. Moreover, we cannot conclude that, under the circumstances, introduction of this evidence was more prejudicial than probative. See Tenn. R. Evid. 403. The defendant urges that State v. Hicks, 835 S.W.2d 32 (Tenn. Crim. App. 1992), places a temporal limitation on such statements; it is our opinion, however, that no specific temporal limitation exists. In Smith, our high court held that, given the relevance of the defendant's threats toward the victim between two and five months before the killings, any evidence of remoteness went to the weight of the evidence, not its admissibility. 868 S.W.2d at 575; see also State v. Haun, 695 S.W.2d 546, 550 (Tenn. Crim. App. 1985) (holding that while "a lapse of time may, of course, affect [the relevance of evidence], it is the rational connection between events, not the temporal one, that determines whether the evidence has probative value."). In our view, the trial court did not abuse its discretion in admitting these statements.

## II.

The defendant next contends that the trial court erred by denying his motion for judgment of acquittal. Specifically, the defendant asserts that the evidence is insufficient to support his convictions for rape and aggravated kidnapping.[5] The standard by which a trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction; that is, whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Gillon, 15 S.W.3d 492, 496 (Tenn. Crim. App. 1997), perm. to appeal denied, (Tenn. 1998) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781 (1979)); see also State v. Ball, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998). To determine whether the evidence is sufficient to sustain the conviction, the trial court must consider "the evidence introduced by both parties, disregard any evidence introduced by the accused that conflicts with the evidence adduced by the State, and afford the State the strongest legitimate view of the evidence, including all reasonable inferences which may be drawn from the evidence." State v. Campbell, 904 S.W.2d 608,

---

[5]The defendant does not contest the sufficiency of the evidence with regard to his convictions for first degree murder or theft.

611 (Tenn. Crim. App. 1995) (citing State v. Hall, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983)).

Although charged with aggravated rape, the defendant was convicted of the lesser-included offense of rape. In order to sustain a conviction for rape, the State must prove beyond a reasonable doubt that the defendant used force or coercion to accomplish the unlawful sexual penetration of the victim. See Tenn. Code Ann. § 39-13-503(a)(1). Here, the evidence adduced at trial established that the DNA profile of sperm found in the vagina and anus of the victim matched that of the defendant. Such evidence overwhelmingly establishes penetration of the victim by the defendant. No direct evidence, however, exists as to the defendant's use of force or coercion at the time of the sexual penetration. Indeed, there was no medical evidence of trauma or force at the time of the penetration.

The law is well settled that a criminal offense, or any element thereof, may be proven entirely by circumstantial evidence. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971). A conviction may not, however, be based upon conjecture, guess, or speculation. State v. Jenkins, 733 S.W.2d 528 (Tenn. Crim. App. 1987). When a conviction is based upon circumstantial evidence, the facts and circumstances must be so overwhelming as to exclude any other explanation except for the defendant's guilt. State v. Black, 815 S.W.2d 166, 175 (Tenn. 1991); State v. Tharpe, 726 S.W.2d 896, 900 (Tenn. 1987). While our standard of review is the same whether a conviction is based upon direct or circumstantial evidence, when the State seeks to prove the existence of an element entirely through circumstantial evidence, as it does with regard to the elements of force and coercion is this case, such evidence must exclude every other reasonable theory except that of guilt. Marable v. State, 313 S.W.2d 451 (Tenn. 1958); see State v. Brown, 551 S.W.2d 329 (Tenn. 1977).

The testimony of Ms. Stagner, the victim's neighbor, established that the defendant and the victim were arguing outside the victim's apartment complex on the evening before the shooting. Testimony offered by the victim's co-workers, friends, and her attorney established that the victim feared the defendant and did not want to continue their relationship. Finally, the testimony of Nancy Leonard confirmed that the defendant had attacked the victim in the past and that the victim, in fact, believed that the defendant would kill her. This evidence served to show that the victim would not have voluntarily accompanied the defendant from her apartment and certainly would not have voluntarily consented to sexual intercourse with him. Because this testimony was properly admitted, as indicated above, and was rebutted only by the defendant's claim that he maintained a social and sexual relationship with the victim even after their divorce, the issue is essentially one of credibility. This Court will not resolve questions of witness credibility on appeal, that function being solely within the province of the trier of fact. See, e.g., State v. Carey, 914 S.W.2d 93, 95 (Tenn. Crim. App. 1995). We decline the defendant's invitation to overturn his conviction by making a choice different from that of the jury. In our view, the evidence is sufficient to support the defendant's conviction for rape.

The defendant was convicted of one count of especially aggravated kidnapping accomplished by the use of a deadly weapon and one count of especially aggravated kidnapping because the victim

suffered serious bodily injury. He asserts that the evidence is insufficient to support these convictions because testimony establishing the victim's unwillingness to voluntarily accompany him should not have been admitted. As stated above, this testimony was properly admitted. Additionally, he contends that testimony offered by Ms. Stagner that the defendant moved the victim into the passenger side of her Jeep while they were arguing in the parking lot of the apartment complex should have been stricken pursuant to the cancellation rule. Finally, he claims that the conviction for removing the victim from the lobby of the Econo Lodge is barred by State v. Anthony, 817 S.W.2d 299 (Tenn. 1991).

To obtain a conviction for especially aggravated kidnapping, the State must prove that the defendant knowingly removed or confined the victim unlawfully so as to interfere substantially with her liberty and that the removal or confinement was accomplished by the use of a deadly weapon or that the victim suffered serious bodily injury. Tenn. Code Ann. §§ 39-13-302(a), -305(a). The theory advanced by the State at trial was that the defendant kidnapped the victim when he removed her from the parking lot of her apartment complex. Additionally, the State contended that the removal and confinement were accomplished by the use of a deadly weapon and that the victim suffered serious bodily injury.

The defendant asserts that because she gave differing accounts of what took place, the testimony of Ms. Stagner on the issue of whether the defendant removed or confined the victim at her apartment complex is subject to exclusion pursuant to the rule of cancellation. Without this testimony, the defendant contends, there is no evidence to prove that a kidnapping occurred at the apartment complex. The rule of cancellation provides that contradictory statements by the same witness regarding a single fact cancel each other out. See Church v. Perales, 39 S.W.3d 149, 169-70 (Tenn. Ct. App. 2000) (citing State v. Matthews, 888 S.W.2d 446, 449 (Tenn. Crim. App. 1993)); Gambill v. Middle Tenn. Med. Ctr., 751 S.W.2d 145, 149-50 (Tenn. Ct. App. 1988). Our supreme court has characterized mutually contradictory statements by the same witness as "no evidence" of the fact sought to be proved. Johnston v. Cincinnati N.O. & T.P. Ry., 146 Tenn. 135, 160, 240 S.W. 429, 436 (1922); see also State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000). Testimony may be disregarded under the rule of cancellation only when the allegedly contradictory statements are unexplained and neither statement is corroborated by other competent evidence. Church, 39 S.W.3d at 170 (citations omitted). Explanation of inconsistent testimony or corroboration defeats the cancellation effect. See Matthews, 888 S.W.2d at 449. Ms. Stagner testified on direct examination that she "saw [the defendant] move [the victim] over into the passenger side and him get in the driver's side." When Ms. Stagner was recalled as a witness, the following exchange took place:

Q: Ms. Stagner, you testified yesterday and you told us that you saw the defendant move Cherilyn Leonard from the driver's side of the Jeep over into the passenger seat; do you recall saying that?
A: He didn't physically move her. She moved over.
Q: Okay, so if that is what I thought I heard you say yesterday that he moved her over, that would be incorrect, wouldn't it?

A: Well, he didn't physically like pick her up and move her over, but he gets in and you know, she has to move over, otherwise, he is going to sit on top of her.

Q: Well, she moved over on her own, didn't she?

A: Yeah.

Here, Ms. Stagner's testimony presented no inconsistency. To the contrary, her second statement was offered to clarify and explain her original testimony. Thus, the rule of cancellation is inapplicable, and the testimony could properly be considered by the jury.

The evidence adduced at trial established that on the evening before the shooting, the victim was seen arguing with the defendant in the parking lot of her apartment complex. The defendant got into the driver's side of the victim's vehicle. Later, the vehicle was seen parked on the opposite side of the parking lot from the victim's usual space. The victim failed to report to work that evening, even after she told George Matthews that she would be there at 8:30 p.m. as scheduled. Several witnesses testified that the victim had, on more than one occasion, expressed fear of the defendant. Furthermore, moments before the shooting, the defendant and victim were seen in the lobby of the Econo Lodge Motel. A motel employee stated that as the victim walked toward the phone, the defendant "followed right on her tail." There the defendant stood about eight inches away from the victim. When the victim told her friend on the phone that the defendant had kidnapped her, the defendant slammed the phone on the hook and dragged the victim outside. While being dragged from the motel lobby, the victim told the motel employee that she "could call the police now." From these facts, a jury could properly conclude that the victim was abducted against her will.

After the victim was dragged from the motel lobby out to the parking lot, a struggle between the defendant and the victim was witnessed by a patron of the motel. At this point, the defendant pulled out a gun and shot the victim. The victim then managed to break free of the defendant and attempted to re-enter the motel lobby. The injured victim had made her way from the parking lot through one lobby door when the defendant entered and fatally shot the victim. From these facts, a jury could properly conclude that the victim tried to escape from the defendant, her kidnapper.

The question these facts present is whether or not the kidnapping was accomplished by use of a deadly weapon. We note that kidnapping is a continuing offense. State v. Legg, 9 S.W.3d 111, 117 (Tenn. 1999). "So long as the removal or confinement of the victim lasts, the offense of false imprisonment continues." It is true, no evidence exists that the defendant employed a deadly weapon during the removal. It is also true, no evidence exists that the defendant employed a deadly weapon during the confinement of the victim in the motel room. However, there is sufficient evidence to conclude that the defendant did employ the use of a deadly weapon, to wit: a gun to prevent or discourage the victim's escape. Therefore, we conclude that a kidnapping accomplished by the use of a deadly weapon is sufficiently established by the proof.

With regard to the remaining especially aggravated kidnapping conviction, there is evidence that during the unlawful confinement the victim suffered four gunshot wounds which resulted in her

death, fulfilling the element of serious bodily injury. Thus, the evidence is sufficient to support the defendant's conviction for especially aggravated kidnapping.

The defendant claims that because the restraint of the victim in the parking lot of the Econo Lodge was "essentially incidental" to her murder, his convictions for especially aggravated kidnapping are barred by State v. Anthony, 817 S.W.2d 299 (Tenn. 1991). In Anthony, our supreme court held that dual convictions for kidnapping and robbery violate due process when the detention of the victim resulting in the kidnapping conviction is incidental to the robbery. The appellate courts of this state have recognized that a period of confinement or restraint is inherent in certain offenses, such as rape and robbery. The paramount question, therefore, is "whether the confinement, movement, or detention is essentially incidental to the accompanying felony and is not . . . sufficient to support a separate conviction for kidnapping." Anthony, 817 S.W.2d at 306 (citation omitted). Our supreme court has held that the focus of an Anthony inquiry is upon the "purpose of the removal or confinement and not the distance or duration." State v. Dixon, 957 S.W.2d 532, 535 (Tenn. 1997). If the purpose of the removal or confinement is "not necessary for the commission of the [underlying felony]," the kidnapping is not incidental to the other offense. Id. If the "movement or confinement is beyond that necessary to consummate the [underlying offense]," the next inquiry is "whether the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." Dixon, 957 S.W.2d at 535 (citing Anthony, 817 S.W.2d at 306). Affirmative answers to these inquiries support affirmance of a contemporaneous kidnapping. Dixon, 957 S.W.2d at 535.

In Anthony, the court was concerned that the kidnapping statute "be applied so as to protect the due process rights of those accused of both kidnapping and other offenses that necessarily involve the detention of a victim." See State v. Zonge, 973 S.W.2d 250, 256 (Tenn. Crim. App. 1997), perm. to appeal denied, (Tenn. 1998). In the instant case, the defendant's own testimony belies his argument that the detention of the victim was essentially incidental to her murder. The defendant testified that he did not intend, at any time, to kill the victim. Thus, because the purpose of the detention was not to commit the murder, the Anthony rationale is inapplicable. This issue is without merit.

**III.**

The defendant next contends that the trial court erred by prohibiting the use of the victim's telephone records to impeach the testimony of Nancy Leonard and Tia Ayers. As indicated above, Nancy Leonard and Tia Ayers testified that the victim expressed her desire to avoid any contact with the defendant in the future. During cross-examination of these witnesses, the defendant sought to question them about the victim's telephone records, which show a number of phone calls placed from the victim's residence to either the defendant's residence in Clarksville or to Fort Bragg, where the defendant was briefly stationed. Defense counsel also sought to specifically question Tia Ayers regarding a telephone call placed to the defendant's home on August 31, 1996, when the defendant was incarcerated in Illinois. The trial court ruled that it would allow counsel to question the

witnesses about whether they would be surprised to learn that the victim had called the defendant on several occasions but that counsel would not be permitted to ask about each call individually. The defendant asserts that, because he was not permitted to question Ms. Leonard and Ms. Ayers about each specific telephone call, his right to cross-examination under the Sixth Amendment to the United States Constitution was impermissibly limited.

The Sixth Amendment of the United States Constitution provides that a criminal defendant has the right "to be confronted with the witnesses against him" and this substantial right is made applicable to the States under the Fourteenth Amendment. See Pointer v. Texas, 380 U.S. 400 (1965). The right of confrontation encompasses the right to cross-examine. See Barber v. Page, 390 U.S. 719 (1968). It is the principal means by which the believability of a witness and the truth of his testimony are tested. See Davis v. Alaska, 415 U.S. 308 (1974); Hoffa v. United States, 385 U.S. 293 (1966), reh'g denied, 386 U.S. 940 (1967).

The right to confront and cross-examine is not absolute however, and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. See Chambers v. Mississippi, 410 U.S. 284, 295 (1973). In the present case, the defendant sought introduction of the telephone records of the victim to contradict the testimony of Nancy Leonard and Tia Ayers. It is proper for a party to contradict and discredit an adverse witness by showing the facts to be other than as testified to by such witness. See generally Neil P. Cohen et al., *Tennessee Law of Evidence* § 6.07[4][d] (4th ed. 2000). This method of impeachment is quite restricted. First, impeachment is not allowed as to "collateral" matters, so only if the point on which the witness' testimony is being contradicted is material to the issues in the case or is relevant to the witness' credibility apart from the contradiction may the contradiction be shown by the use of extrinsic evidence. Id. If the fact being contradicted is deemed collateral, counsel must use cross-examination of the witness being impeached to bring out the contradictory fact and must accept the witness' response, even if it is a denial that counsel could disprove. Id.

The propriety, scope, manner and control of testimony and other evidence, including the scope of cross-examination, remains within the sound discretion of the trial court, which will not be reversed absent an abuse of that discretion. See State v. Barnard, 899 S.W.2d 617, 624 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1994) (citing State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978)); State v. Elrod, 721 S.W.2d 820, 823 (Tenn. Crim. App. 1986); Tenn. R. Evid. 611(a).

Here, Nancy Leonard and Tia Ayers testified that the victim was no longer involved with the defendant. The defendant asserted at trial that he and the victim had maintained a relationship even after their divorce. Evidence of the telephone calls was therefore relevant on the issue of whether there was contact between the defendant and the victim during the same period in which the victim told witnesses she was afraid of the defendant and claimed to have no contact with him. Thus, the trial court properly found that the defendant could question the witnesses regarding the telephone calls made by the victim to the defendant. Moreover, the trial court correctly concluded that this issue was material and that the existence of the telephone calls could be proven by extrinsic evidence. Notwithstanding its finding that the issue was material and that extrinsic evidence could

be used to prove that the victim had telephoned the defendant, the trial court acted within its discretion when it limited counsel's cross-examination of the witnesses to whether they would be surprised to learn that the victim had made numerous telephone calls to the defendant. To permit counsel to question the witnesses as to each and every telephone call made by the victim could have been unnecessarily time consuming and cumulative. See generally Tenn. R. Evid. 403. This issue is without merit.

In a related issue, the defendant complains that the trial court's ruling that questions based upon a collect call that the victim accepted from the defendant, placed while he was incarcerated in Edwardsville, Illinois, might "open the door" for the State to inquire about the defendant's incarceration was an impermissible restriction on his right to cross-examination.

The record indicates that after the trial court ruled that questions about the telephone call might permit the State to inquire into the reasons for the defendant's incarceration, defense counsel agreed not to cross-examine the witness about the call. Subsequently, during cross-examination of the defendant, the State utilized the telephone records to emphasize that no telephone calls were made from the victim's residence to the defendant's residence after September 1, 1996. Defense counsel objected and the following colloquy occurred:

> MS. KERSH: Your Honor, this is improper. He's trying to open the door to the Illinois material. He's going to ask my client that there aren't any phone calls on there for all these months, and he knows that he was in jail, but my client can't explain it.
>     *         *         *
> GENERAL BROLLIER: Your Honor, I'm not trying to open the door. The phone records speak for themselves. I believe that he will have to review those and testify that there are no phone calls from her apartment or her phone number to his house after September 1, 1996. That's all I intend to ask him about. Not where he was in that time frame.
> MS. KERSH: That's not fair, Your Honor, because he can't explain it without opening the door to the Illinois material. I didn't go into the August 31st phone call specifically to keep from doing that. Mr. Brollier can argue that to the jury in his closing argument just like I have to do. I just think it's improper.
> THE COURT: Weren't these records introduced by his own testimony a minute ago?
> MS. KERSH: No, sir. These are her phone records. They were introduced the other day.
> THE COURT: Oh, okay.
> GENERAL BROLLIER: They've made it a central theory in this case that she was in touch with him and calling him all the time, and I believe I am entitled to–
> THE COURT: Okay. As long as you don't say anything about jail or Illinois. You can go ahead.
> MS. KERSH: Your Honor, I just want my objection noted that he can't explain.

The defendant complains that the trial court's ruling prevented him from developing the fact that, while incarcerated in Illinois, he conversed with the victim by placing a collect telephone call to her residence. In essence, the defendant sought to reveal each specific telephone call made between the defendant and the victim, but conceal the location from which each telephone call was made. Additionally, the defendant contends that the exclusion of the specific reference to telephone calls made between the victim and the defendant during the period of his incarceration allowed the jury to infer incorrectly that the victim had no contact with the defendant from September 1, 1996, until the time of the offenses in the instant case.

Here, the trial court permitted both the State and the defendant to question the witnesses about the total number of calls made by each party to the other during the months preceding the murder. Further, the trial court specifically instructed the prosecutor that he could question the defendant regarding the telephone records "as long as you don't say anything about jail or Illinois." Any discrepancies inferred through the State's questioning of the defendant and the defendant's introduction of the telephone records were for resolution by the jury. We cannot conclude that the trial court abused its discretion.

**IV.**

The defendant alleges that the State failed to disclose exculpatory evidence, as required by Brady v. Maryland, 373 U.S. 83, 83 S. Ct.1194 (1963). Specifically, the defendant argues that the State failed to disclose the contents of an interview with Tia Ayers that occurred on February 16, 1999; failed to turn over the statement of Denise Stagner until the next to the last day of trial; and failed to turn over notes taken by Detective West during an interview of Denise Stagner.

In Brady, the United States Supreme Court held that, in a criminal case, the prosecution has a compelling duty to furnish the accused with exculpatory evidence pertaining either to the accused's guilt or innocence or to the potential punishment that may be imposed. 373 U.S. at 87, 83 S. Ct. at 1196. Exculpatory evidence under Brady includes information or statements of witnesses which are favorable to the accused. See, e.g., State v. Goodman, 643 S.W.2d 375, 379-80 (Tenn. Crim. App. 1982). Moreover, exculpatory evidence under Brady includes information which can be used only for impeachment purposes. See Giglio v. United States, 405 U.S. 150, 154-55 (1972); Workman v. State, 868 S.W.2d 705, 509 (Tenn. Crim. App. 1993). Failure to reveal exculpatory evidence violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. Brady, 373 U.S. at 87. In order to determine the materiality of undisclosed information, the reviewing court must ascertain whether "in [the] absence [of the information] [the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 431 (1995); see also State v. Edgin, 902 S.W.2d 387, 390 (Tenn.), as amended on reh'g, (1995). Thus, in order to prove a Brady violation, a defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Edgin, 90 S.W.2d at 390.

-20-

Before a reviewing court may find a due process violation under <u>Brady</u>, four prerequisites must be satisfied:

(1) The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
(2) The State must have suppressed the information;
(3) The information must have been favorable to the accused; and
(4) The information must have been material.

<u>Id.</u> The defendant bears the burden of demonstrating the elements of this claim by a preponderance of the evidence. <u>See</u> <u>Smith v. State</u>, 757 S.W.2d 14, 19 (Tenn. Crim. App. 1988). "The <u>Brady</u> rule does not require a prosecutor to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive him of a fair trial . . . ." <u>State v. Walker</u>, 910 S.W.2d 381, 389 (Tenn. 1995).

On March 29, 1999, some nine days after the conclusion of the defendant's trial, the State filed with the trial court a tape recorded interview of Tia Ayers taken in February of 1999. The State also filed a transcription of the statement. At the time of filing, the State claimed that Assistant District Attorney General Daniel Broiller received the tape from Detective Miller shortly after the interview but had simply forgotten about it after Ms. Ayers testified at the preliminary hearing. In addition, the State asserted that General Broiller had not listened to the tape nor had he provided a copy of the tape to the defendant. The trial court found that

the statement was not exculpatory nor favorable to the Defendant and that it did not contain any material information which had not been otherwise disclosed in Ms. Ayers['] other statements and pretrial testimony. Furthermore, Ms. Ayers was questioned thoroughly at trial concerning the victim's relationship with the Defendant in 1996 in an effort to show that they had an ongoing romantic relationship and the Court does not find that the defendant was hampered in any way by the State's failure to turn over the February 16th statement.

The defendant asserts that this statement is exculpatory because he "could have used it to show that the decedent represented to friends and acquaintances that the decedent claimed to be repulsed by the defendant while carrying on a relationship with him in secret." The defendant also asserts that had the statement been disclosed, he could have investigated who the people were that Ms. Ayers was referring to when she used the pronoun "we."

The record establishes that the information was requested and was in possession of the State. The defendant argues that Ms. Ayers' statement indicates the victim's desire to maintain a secret relationship with the defendant, thereby rebutting Ms. Ayers' claims that the victim feared the defendant. We believe that the inference derived by the defendant from Ms. Ayers' statement can be viewed as exculpatory to a degree. However, given the evidence in the record, we fail to see how

-21-

the statement was material in terms of undermining our confidence in the verdict. We conclude that the defendant's due process right to a fair trial was not violated by the failure to disclose the statement.

The defendant also complains that the trial court should have declared a mistrial when the State failed to provide a copy of an August 22, 1997 interview with Ms. Stagner until one day before the conclusion of the trial. During cross-examination by the defense, Detective Miller mentioned that in an interview by Metro Police Officer West, Ms. Stagner stated that she had seen the defendant get into the driver's seat and the victim move over to the passenger seat. At the conclusion of Detective Miller's testimony, the defendant requested and received a copy of the interview sheet. The State conceded that the failure to disclose the interview sheet was an oversight and offered the defendant the opportunity to introduce the interview sheet into evidence. After being recalled as a witness, Ms. Stagner was questioned about the actions in the Jeep and clarified her earlier testimony by stating that when she said the defendant moved the victim to the passenger seat, she meant that the victim had to move over because the defendant got into the driver's seat. The trial court determined that

> said statement was given to the Defendant during the trial, that the Defendant was allowed to use it to cross-exam[ine] Ms. [Stagner] at trial, and that the statement was read to the jury. The Court therefore finds that the [d]efendant has not shown that the State suppressed any material information which was exculpatory or otherwise favorable to the defendant. Nor has the [d]efendant shown that there [is] a reasonable probability that the results of the trial would have been different had the Defense had the [Stagner] statement earlier.

Here, the statement does not fall within the parameters of Brady because the information, although delayed, was disclosed. See United States v. Bencs, 28 F.3d 555, 56l (6th Cir. 1994). Brady only applies to a complete failure to disclose exculpatory information and does not apply to delayed disclosure unless the delay itself causes prejudice. See generally United States v. Word, 806 F.2d 658, 665 (6th Cir. 1986). In this case, because disclosure was delayed and not denied, the defendant must demonstrate prejudice to establish a violation. We conclude, as did the trial court, that the defendant has failed to demonstrate that he was prejudiced, in any way, by the delayed disclosure of this statement.

Finally, the defendant complains that the failure to turn over notes taken by Detective West during the investigation was a violation of the Brady rule. Detective West interviewed Ms. Stagner within hours of the shooting and transmitted the information gleaned from the interview to Detective Miller, who recorded the information on a follow-up sheet. The State provided a copy of the follow-up sheet prepared by Detective Miller, but did not disclose the notes taken by Detective West. While alleging that the failure to disclose the notes was a violation of Brady, the defendant has failed to provide any evidence that the notes contained exculpatory material. Thus, the defendant has failed to meet the burden of proof with regard to this claim. This issue is without merit.

# V.

The defendant next asserts that the trial court erred by failing to declare a mistrial after Crystal Jarrett, a witness for the State, erupted several times on the witness stand, gave unresponsive answers to questions, and called defense counsel "mean." The following exchange took place during Ms. Jarrett's testimony:

> [GENERAL BROLLIER]: [D]id you notice something unusual happening that morning?
> [CRYSTAL JARRETT]: That man murdered his wife.
> MS. KERSH: Objection, Your Honor, move to strike and instruct the jury to disregard the witness' use of that word.
> [CRYSTAL JARRETT]: Murder? Well, that's what happened.
> MS. KERSH: Your Honor—
> THE COURT: Ms. Jarrett, if the lawyer makes an objection at any time while you are being asked a question, just wait for a minute and let me rule on it –
> [CRYSTAL JARRETT]: I'm sorry, I just don't know how else to describe what happened[.] That's what it is, and that's how I have always known – when you kill somebody, it's murder.
> MS. KERSH: Your Honor, I object to her conclusion and ask that the jury be instructed to disregard it.
> THE COURT: Ms. Jarrett, let me just tell you the situation here.
> [CRYSTAL JARRETT]: What word should I use, Judge?
> THE COURT: Well – you can just use like —
> [CRYSTAL JARRETT]: The fourth commandment?
> THE COURT: No – hang on just a second. First of all, the General is going to ask you a lot of specific questions . . . you can just tell factually what happened . . it's important that you have an opportunity to give your testimony to these folks here. So, if you need to take a break —
> [CRYSTAL JARRETT]: I'm fine.
> THE COURT: Just for example, if what you saw was him – the defendant shooting someone, just say shooting as opposed to murder. The problem is that murder is a legal word – it is a common word that we hear everyday, but it also has significance from a legal standpoint, so if you will just say shooting, that's fine.
> [CRYSTAL JARRETT]: Shoot and killed her?
> THE COURT: Well, yes . . . those words are fine if that's what you saw.
>      Members of the jury, let me just tell you I think it's pretty clear in this case, and I am not commenting on the evidence and I don't have any opinion about it, but based on the plea to voluntary manslaughter of the defendant, I think that it is going to be pretty apparent that the defendant shot the victim and that she died as a result of the shooting. It is going to be up to you folks what classification, if any that – not, if any because there has been a plea of voluntary manslaughter, so you folks are going to have to decide whether it's

-23-

first degree murder, second degree murder, or voluntary manslaughter is what it amounts to. That's why I am asking the witness not to use the word "murder" because from a legal standpoint, it's up to you folks to decide whether this killing was a murder, first degree, second degree or voluntary manslaughter. That's my response to Ms. Kersh's objection, which is a good objection and it is sustained and just disregard Ms. Jarrett's use of the word "murder." She is not trying to use it in a legal sense, but it is important that you folks make – distinguish between that word, when you get to the instructions, it will be more clear to you.

After this admonition by the trial court, the State resumed direct examination of Ms. Jarrett and the following colloquy took place:

[GENERAL BROLLIER]: All that you saw directly?

[CRYSTAL JARRETT]: Right. It was worse than a horror flick. I thought it was a Hollywood movie.

MS. KERSH: Objection, Your Honor, to the witness' commentary.

THE COURT: I will sustain the objection. What the rules say is that you have to tell the jury what you actually saw or heard and that —

[CRYSTAL JARRETT]: I am not experienced at it –

THE COURT: I understand —

[CRYSTAL JARRETT]: This is my first time. I never asked to be here. I can't help it.

THE COURT: Well, you are doing fine. Just keep doing what you are doing and you will get through just fine. General?

                        *                      *                      *

GENERAL BROLLIER: Did Mr. Leonard ever say anything –

THE COURT: Do you need a break?

[CRYSTAL JARRETT]: No, but [defense counsel] is being mean. It is not my fault I have to be here –

MS. KERSH: Your Honor, I object to that. I ask the jury to be instructed–

[CRYSTAL JARRETT]: Oh, Lord have mercy, God bless your heart.

MS. KERSH: Your Honor, I will ask that the witness be taken from the courtroom if she cannot control herself.

[CRYSTAL JARRETT]: You are a woman. How can you defend a –

MS. KERSH: Your Honor?

[CRYSTAL JARRETT]: – a wife killer?

THE COURT: Ms. Jarrett – all right, -- Ms. Jarrett.

[CRYSTAL JARRETT]: I need a break[.]

THE COURT: Okay. Now, let me just tell you, I know that you don't want to be here. But you are doing fine on your testimony, but the key is, you need to wait until a question is asked, listen to the question and answer it. It is not – Ms. Kersh doesn't have anything personal against you –

-24-

[CRYSTAL JARRETT]: If she would have a little bit more feeling towards me.

MS. KERSH: Your Honor–

THE COURT: Well, that's not the way it has to work, Ms. Jarrett, so I am going to give you about a ten minute break and you will get through this. Just answer the questions, okay.

       *       *       *

COURT: Just step down and relax and you can step outside and we'll start back in about ten minutes.

[CRYSTAL JARRETT]: Jeremy, come here. (inaudible) husbands—

MS. KERSH: Your Honor?

THE COURT: Just go on outside Ms. Jarrett.

After Ms. Jarrett was excused, the defendant asked that the jury be instructed to disregard her unresponsive remarks. The trial court instructed the jury as follows:

> Members of the jury, let me just say this. When a witness testifies . . it can be emotional . . . What you need to do is listen to the factual questions that are asked by the attorneys from both sides and the factual answers and disregard extra things that a witness might throw in and I will instruct you to disregard that type of thing.

> You are basically limited to considering evidence that – of things that a person saw without them injecting their opinion about the significance of what happened or their opinion of the attorney. None of that is relevant and you need to disregard that and just consider basically factual – now when I say facts, it is up to you to decide whether what the witness is saying is true or not. That's totally up to you, but what I am trying to tell you is she's going to be – a witness that should be here to tell you something that they think they saw or heard or otherwise sensed, without injecting their commentary is what it amounts to. We had a little difficulty with Ms. Jarrett, who is obviously emotionally distraught and I am sure you can sort out what she says about what happened as opposed to what her opinions about it or about anybody involved in the case. I think that's about as clear as I can make it. Let me emphasize again that her credibility and whether you believe what she said is true is totally up to you and you can be able to make that determination during your deliberations, along with the assessment of the credibility of all the other witnesses in this case and all the other evidence, and I will give you a very specific instruction about that at the end of the case. I guess that's about as – all I know to say.

The defendant indicated to the trial court that the instruction was sufficient to remedy the problem. The defendant then, after the testimony of Ms. Jarrett and four other witnesses, moved for a mistrial based upon Ms. Jarrett's conduct. The trial court denied the motion, concluding that although Ms. Jarrett provided unresponsive and legally inappropriate answers to questions posed during her examination, the curative instruction given was adequate to protect the rights of the defendant. In

addition, the trial court opined that it was clear to the jury that Ms. Jarrett's "hostility toward the defendant and toward Ms. Kersh . . . should not be considered . . . as evidence in this case."

Initially, we conclude that the defendant has waived this issue by failing to cite any authority in support of his arguments. See Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b); see also State v. Chance, 778 S.W.2d 457, 462 (Tenn. Crim. App. 1989); State v. Killebrew, 760 S.W.2d 228, 231 (Tenn. Crim. App. 1988). Additionally, counsel acquiesced to the trial court's curative instruction and declined the opportunity to suggest amendments to the court's curative charge. Having failed to contest the sufficiency of the curative instruction given by the court, the defendant cannot now complain that such an instruction was insufficient. See Tenn. R. App. P. 36(a). Notwithstanding waiver of this claim, the defendant would not have prevailed on the merits.

"The entry of a mistrial is appropriate when the trial cannot continue for some reason, or if the trial does continue, a miscarriage of justice will occur." State v. McPherson, 882 S.W.2d 365, 370 (Tenn. Crim. App. 1994). The decision to grant a mistrial is within the sound discretion of the trial court, and this Court will not disturb the trial court's determination unless a clear abuse of discretion appears on the record. Id.

In the present case, Ms. Jarrett's comments were spontaneous and unsolicited. The trial court properly instructed the jury to disregard her statements. We presume that the jury followed these instructions. See generally State v. Woods, 806 S.W.2d 205, 211 (Tenn. Crim. App. 1990). Accordingly, we find no abuse of discretion in the trial court's denial of the motion for mistrial.

## VI.

The defendant makes numerous challenges to the trial court's charge to the jury. Under the United States and Tennessee Constitutions, a defendant has a constitutional right to trial by jury. U.S. Const. amend. VI; Tenn. Const. Art. I, § 6; see also State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000). In Tennessee, the right to trial by jury demands that "all issues of fact be tried and determined by twelve jurors." Garrison, 40 S.W.3d at 432. Thus, a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions. Id.

Jury instructions given at trial should not be measured against a "standard of perfection." City of Johnson City v. Outdoor West, Inc., 947 S.W.2d 855, 858 (Tenn. Ct. App. 1996). In evaluating claims of error in jury instructions, courts must remember that "'[j]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning'" but instead may be presumed to utilize "'commonsense understanding of the instructions[.]'" State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998) (quoting Boyde v. California, 494 U.S. 370, 380-81 (1990)). Therefore, we review each jury instruction to determine if it fairly submitted the legal issues involved and did not mislead the jury. See State v. Hall, 958 S.W.2d 679, 696 (Tenn. 1997) (citing State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997)).

The defendant, citing State v. Cravens, 764 S.W.2d 754, 756 (Tenn. 1989), complains that the court's failure to clearly define the required culpable mental state following each count of the indictment constitutes reversible error. In its order denying the defendant's motion for new trial, the trial court found that each culpable mental state was defined in the instructions given to the jury and noted that "the [d]efendant did not object to the form of the Court's instructions and that the instructions fairly submitted the legal issues to the jury."

Initially, we note that, because the defendant did not object to the form or fullness of the instructions, the issue is not appropriate for appellate review. See generally Cravens, 764 S.W.2d at 756. Nevertheless, we choose to address the merits of the defendant's claim.

In Cravens, our supreme court concluded that "all of the elements of each offense should be described and defined in connection with that offense, although . . . there could be cross-referencing or repetition in connection with the lesser offenses since jury instructions in felony cases are required by statute to be written and physically delivered to the jurors for use in their deliberations." Id. Further, our high court held that combining the charge regarding two different degrees of murder was not generally approved of, but did not constitute reversible error. Id. Here, the court defined the terms intentionally, knowingly, and recklessly after it finished defining each of the crimes with which the defendant was charged. While the defendant argues that this method left the jury with the impression that those definitions applied only to the rape charge that immediately preceded them, there is nothing to suggest that this is true. Generally, the failure to repeat a definition is deemed harmless error. State v. Nichols, 877 S.W.2d 722, 735 (Tenn. 1994); State v. Wright, 756 S.W.2d 669, 675 (Tenn. 1988); State v. Laney, 654 S.W.2d 383, 388-89 (Tenn. 1983). Accordingly, any error resulting from the failure to repeat the definitions of the culpable mental states is harmless.

The defendant next contends that the definition of the knowing mental state provided by the trial court "inaccurately states the law." The trial court defined the knowing mental state as follows:

> A person acts 'knowingly' if that person acts with an awareness either:
>     (1) that his or her conduct is of a particular nature; or
>     (2) that a particular circumstance exists.

The defendant asserts that this definition, adopted from the Tennessee Pattern Jury Instructions, is erroneous because it omits the part of the instruction which states that a person acts knowingly if that person acts with an awareness that the conduct was reasonably certain to cause the result. See Tenn. Code Ann. § 39-11-106(20).[6] The defendant contends that by providing a blanket definition of "knowing," the trial court erroneously provided the jury with the choice of determining which definition of knowing to apply to the crime charged. He claims that the statute defining the crime

---

[6] Section 39-11-106(20) defines "knowing" as follows:

"Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

dictates which of the three possible definitions is appropriate. Accordingly, the defendant asserts, the blanket instruction provided with regard to the offenses of theft of property, unauthorized use of a vehicle, especially aggravated kidnapping, premeditated first degree murder, second degree murder, voluntary manslaughter, first degree felony murder, aggravated rape, and rape lessened the State's burden of proof and constitutes reversible error.

Recently, in State v. Ducker, 27 S.W.3d 889 (Tenn. 2000), our supreme court dealt with a similar issue. There, our high court ruled as follows:

> A result of conduct offense requires that the culpable mental state accompany the result as opposed to the nature of the conduct. The focus is on whether the actor possessed the required culpability to effectuate the result that the legislature has specified. Generally, an offense may be classified as a result of conduct offense when the result of the conduct is the only element contained in the offense.

Id. at 896. Further, the court noted that "a result of conduct crime does not require as an element that an actor engage in a specified course of conduct to accomplish the specified result." Id.

Using these guidelines, theft of property is not a result of conduct offense because the conduct proscribed is not criminalized because of its result, but instead the conduct is criminal because of the circumstances surrounding the taking of the property of another. Accordingly, the trial court's failure to include the result of conduct language in its definition of knowing was not error with regard to the defendant's conviction for theft of property. Additionally, we note that any error which may have occurred with regard to the instruction on the culpable mental state for the charge of unauthorized use of a motor vehicle would be harmless because the defendant was not convicted of this offense.

In much the same respect, especially aggravated kidnapping is not a result of conduct offense. Especially aggravated kidnapping is established when the proof shows that the defendant knowingly removed or confined another unlawfully so as to interfere substantially with the other's liberty and the victim suffered serious bodily injury or that the defendant knowingly removed or confined another unlawfully so as to interfere substantially with the other's liberty and the confinement or removal was accomplished with a deadly weapon. See generally Tenn. Code Ann. § 39-13-305. The word "knowingly" clearly modifies the words removed or confined. Thus, the State was required to show, and the court was required to instruct, that the defendant committed especially aggravated kidnapping if he removed or confined the victim and did so knowing that the removal or confinement was unlawful. The defendant did not have to know his actions would cause serious bodily injury. See e.g., Ducker, 27 S.W.2d at 897. In our view, there was no error in the trial court's definition of knowing provided to the jury.

Generally, all homicides are result of conduct offenses. Clearly, first degree premeditated murder is a result of conduct offense, as is second degree murder. See generally State v. Keith T. Dupree, No. W1999-01019-CCA-R3-CD (Tenn. Crim. App. at Jackson, Jan. 30, 2001) (citing

Ducker, 27 S.W.3d at 896). First degree felony murder, however, combines the result of the conduct and the nature of the conduct because the killing must be committed during the commission of an enumerated criminal offense. Similarly, voluntary manslaughter involves not only the result of the conduct (the death of the victim) but also the circumstances surrounding the conduct (state of passion of defendant). Here the defendant was found guilty of first degree premeditated murder. The mens rea required is intentional. The instruction concerning the intentional mens rea was correct. The defendant, having been found guilty of the greater offense, requiring an intentional element, renders any errors concerning the knowing instruction on the lesser-included offenses harmless.

The offense of rape, as defined in the present case, is established when the proof establishes the unlawful sexual penetration of a victim by the defendant or the defendant by a victim and such penetration is accomplished by one of the three factors enumerated in the statute. See Tenn. Code Ann. § 39-13-503(a). No mens rea is set forth in the statute. When the definition of an offense does not specify a culpable mental state, intent, knowledge, or recklessness is sufficient to establish the required mens rea. See Tenn. Code Ann. § 39-11-301(c). In consequence, any error in the trial court's definition of "knowingly" would be harmless.

The defendant next asserts that the trial court omitted the word "and" between subsections two and three of its instruction on the elements of unauthorized use of an automobile and that such omission was reversible error. As noted above, the defendant was not convicted of this offense, thus any error with regard to the instruction would be harmless. Moreover, in our view, the omission was not error. The trial court provided the following instruction:

> Any person who commits the offense of unauthorized use of an automobile or other vehicle is guilty of a crime.
> For you to find the defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements:
>     (1) that the defendant took another's automobile;
>             and
>     (2) that the taking was without the consent of the owner;
>     (3) that the defendant did not have the intent to deprive the owner thereof;
>             and
>     (4) that the defendant acted either intentionally, knowingly or recklessly.

The trial court found its charge was correct and not misleading. In our view, the instruction clearly indicates that all of the elements are required and thus, that the instruction was proper.

The defendant additionally complains that the court failed to instruct that a removal or confinement is unlawful if it is accomplished by force, threat or deception. The trial court provided the above language in its charge for false imprisonment and especially aggravated kidnapping. Thus there is no error.

The defendant next asserts that the court erroneously instructed the jury that they could find the defendant guilty of rape under the theory that "the sexual penetration was accomplished without the consent of the alleged victim and the defendant knew, or had reason to know, at the time of the penetration that the alleged victim did not consent." The defendant has failed to cite any authority in support of his position that the trial court's instruction was error and has, thus, waived the issue. See Tenn. R. App. P. 27.

The defendant also cites as error the trial court's failure to define "sexual penetration," "cunnilingus," "fellatio," "force," "coercion," and "victim." The trial court defined each of these terms in conjunction with its charge on aggravated rape. As indicated above, failure to repeat a definition that has already been provided results in harmless error. See Nichols, 877 S.W.2d at 735.

The defendant additionally alleges that the trial court should have provided a limiting instruction on the use of other bad acts evidence in a witness specific manner rather than only providing such an instruction during its final charge to the jury. With regard to the prior bad acts or uncharged conduct of the defendant, the trial court instructed the jury as follows:

> If from the proof you find that the defendant has committed a crime other than that for which he is on trial, you may not consider such evidence to prove his disposition to commit such a crime as that on trial.
> This evidence may only be considered by you for the limited purpose of determining whether it provides evidence of the State of mind of [the victim] toward the defendant and the State of mind of the defendant toward [the victim].
> Such evidence of other crime[s], if considered by you for any purpose, must not be considered for any purpose other than that specifically stated.

The defendant also complains that the purpose enumerated by the court, the state of mind of the victim and the defendant, is not a purpose for which this state has permitted the introduction of other acts evidence.

The trial court determined that the jury was properly instructed as to the use of the prior bad act evidence. Initially, we note that the defendant did not at any time ask the court to provide a limiting instruction and specifically did not request such an instruction during the testimony of each witness who provided other acts evidence. Tennessee Rule of Evidence 105 states that "[t]he court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly." Tenn. R. Evid. 105. Thus, the burden of triggering a request for a limiting instruction is upon the party who seeks or is entitled to the instruction. The failure to request a limiting instruction results in the waiver of the issue. Tenn. R. App. P. 36(a); State v. Gibson 973 S.W.2d 231, 244 (Tenn. Crim. App. 1997).

The defendant next contends that the trial court erred by denying his requested jury instruction that multiple gunshots were not sufficient by themselves to establish the element of premeditation. Specifically, the defendant requested that the trial court instruct the jury as follows:

Repeated gunshots inflicted on the victim is not sufficient, by itself, to establish first degree murder. Repeated gunshots can be delivered in the heat of passion, with no design or reflection.

On this issue we find guidance from Judge Koch's opinion in <u>Mitchell v. Smith</u>, 779 S.W.2d 384 (Tenn. Crim. App. 1989). <u>Mitchell</u> stands for the proposition that trial courts should give a requested instruction if it satisfies three requirements: (1) it is supported by the evidence, (2) it embodies the party's theory, and (3) it is a correct statement of the law. In the instant case, the trial court denied the defendant requested instruction and proceeded to instruct the jury from the Tennessee Pattern Jury Instruction Crim. 7.01. This Court has approved the contents of this pattern instruction as containing an adequate definition of premeditation. <u>State v. Kenneth Lamont Anthony</u>, No. M2000-00839-CCA-R3-CD (Tenn. Crim. App., filed Apr. 27, 2001, at Nashville). After a thorough review, we conclude the trial court erred in failing to give the requested instruction. However, the error was harmless.

The defendant also claims that the trial court erred by failing to instruct the jury as to the lesser-included offenses of especially aggravated kidnapping and first degree murder. In <u>State v. Burns</u>, 6 S.W.3d 453 (Tenn. 1999), our supreme court revised the standards for the determination of lesser-included offenses. In a companion case, <u>State v. Dominy</u>, 6 S.W.3d 472 (Tenn. 1999), our high court confirmed that it had overruled that portion of <u>State v. Trusty</u>, 919 S.W.2d 305 (Tenn. 1996) which had established a distinction between lesser grades or classes of offenses and lesser-included offenses. In <u>Burns</u>, the court adopted a modified version of the Model Penal Code in order to determine what constitutes a lesser-included offense:

> An offense is a lesser-included offense if:
>   (a) all of its statutory elements are included within the statutory elements of the offense charged; or
>   (b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
>     (1) a different mental state indicating a lesser kind of culpability; and/or
>     (2) a less serious harm or risk of harm to the same person, property or public interest, or
>   (c) it consists of
>     (1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
>     (2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
>     (3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

Burns, 6 S.W.3d at 466-67. Using this analysis, aggravated kidnapping is a lesser-included offense of especially aggravated kidnapping. Additionally, reckless homicide is a lesser-included offense of first degree murder.

Having determined that aggravated kidnapping is a lesser-included offense of especially aggravated kidnapping and that reckless homicide is a lesser-included offense of first degree murder, the next inquiry is whether the evidence justified an instruction on those offenses. Burns, 6 S.W.3d at 467. The guiding principle is that if there is evidence in the record from which the jury could conclude that a lesser-included offense was committed, there must be an instruction for the lesser offense. See Johnson v. State, 531 S.W.2d 558, 559 (Tenn. 1975). In Burns, our supreme court adopted a two-step process for determining whether the evidence justifies a jury instruction on a lesser-included offense:

> First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

Burns, 6 S.W.3d at 469. In State v. Allen, 69 S.W.3d 181 (Tenn. 2002), our high court ruled that trial courts "must provide an instruction on a lesser-included offense supported by the evidence even if such instruction is not consistent with the theory of the State or of the defense. The evidence, not the parties, controls whether an instruction is required." Id. at 188. Our supreme court observed that the "jury is not required to believe any evidence offered by the State," and held that the authority of the jury to convict on a lesser-included offense may not be taken away, even when proof supporting the element distinguishing the greater offense from the lesser offense is uncontroverted. Id. at 189.

The evidence adduced at trial established that the defendant was observed arguing with the victim in the parking lot of the apartment where she lived on the evening before the shooting. Numerous acquaintances and co-workers of the victim testified that the victim feared the defendant and would not have gone anywhere with him voluntarily. There was evidence that the defendant possessed a weapon from the time he left Fort Campbell earlier in the day. Witnesses at the Econo Lodge observed the defendant drag the victim from the lobby, wrestle her to the ground, and then shoot her. When the victim was able to get free from the defendant, he chased her back into the lobby of the hotel, where he shot her three more times. Under these circumstances, instructions on aggravated kidnapping and reckless homicide were supported by the evidence.

Because the evidence supported instructions on both aggravated kidnapping and reckless homicide, the trial court erred by omitting these instructions. Our next inquiry is whether the error was harmless. In Allen, our supreme confirmed that "[a]n erroneous failure to give a lesser-included

offense instruction will result in reversal unless a reviewing court concludes beyond a reasonable doubt that the error did not affect the outcome of the trial." Allen, 69 S.W.3d at 189 (citing State v. Bowles, 52 S.W.3d 69, 77 (Tenn. 2001)). Our high court observed that "[t]he improper omission of a lesser-included offense is analogous to the improper omission of an element of an offense. Omitting an instruction on a lesser-included offense denies the jury the option of rejecting a greater offense in favor of a lesser offense." Id. Moreover, the court ruled as follows:

> Constitutional harmless error analysis does not require harmlessness to be necessarily demonstrated by the jury's verdict. The same reasoning applies to the improper omission of a lesser-included offense. The error may be harmless when the jury "necessarily rejected" all the lesser-included offenses by rejecting an intermediate offense. This analysis does not, however, limit harmless error to cases in which the jury necessarily rejected all other lesser-included offenses.

Id. at 190 (citation omitted). Our supreme court directed that in determining whether the improper omission of a lesser-included offense was harmless beyond a reasonable doubt, "a reviewing court should conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury." Id. at 191.

The State contends that the trial court committed no error by failing to provide an instruction on reckless homicide because there was no evidence that the defendant acted other than intentionally in shooting the victim. As indicated above, our supreme court has held that the trial court must provide an instruction on any lesser-included offense supported by the evidence, even when proof of the element supporting the greater offense is uncontroverted. See id. at 189.

In the alternative, the State asserts that any error in failing to instruct on the lesser-included offense of reckless homicide was harmless beyond a reasonable doubt because the trial court provided instruction on the intermediate lesser-included offenses of second degree murder and voluntary manslaughter, each of which was rejected by the jury. We agree. Here, the defendant was convicted of the highest crime with which he was charged, first degree murder. Therefore, the jury was presented with and declined to exercise its option of convicting on either of the two intermediate offenses. The jury chose to reject the defendant's theory that he shot the victim only after adequate provocation, as was its prerogative. The proof was overwhelming that the defendant shot the victim four times either in the lobby or the parking lot of the Econo Lodge. Two of the shots were fired as the victim lay on the ground, motionless. In our view, the trial court's failure to instruct the jury on the lesser-included offense of reckless homicide was harmless beyond a reasonable doubt.

We also conclude that the trial court's failure to instruct the jury on the lesser-included offense of aggravated kidnapping as a lesser offense of especially aggravated kidnapping where the victim suffers serious bodily was harmless beyond a reasonable doubt. In the instant case, the defendant pled guilty to manslaughter. Overwhelming evidence existed that the defendant possessed a gun and used it to kill the victim. The defendant admitted as much. The only element of especially aggravated kidnapping where the victim suffers serious bodily injury contested by the defendant is

false imprisonment of the victim. All relevant lesser-included offenses of especially aggravated kidnapping contain the common element of false imprisonment. The jury's verdicts in this case reflect that it found beyond a reasonable doubt that the defendant falsely imprisoned the victim. As noted, the evidence of every element in aggravation of the kidnapping where the victim suffers serious bodily injury was overwhelming. There simply is no basis for a reasonable doubt as to the jury finding the defendant guilty of especially aggravated kidnapping where the victim suffers serious bodily injury, even in the jury knew of the lesser-included offenses.

As such, we affirm the conviction for especially aggravating kidnapping where the victim suffered serious bodily injury because the error in failing to charge lesser-included offenses was harmless beyond a reasonable doubt. See State v. Allen, 69 S.W.3d 181, 189-90 (Tenn. 2002).

As relates to the trial court's failure to instruct an aggravated kidnapping as a lesser-included offense of especially aggravated kidnapping accomplished by the use of a deadly weapon, we cannot find the error harmless beyond a reasonable doubt. We remand this cause for a new trial. The question here is the difference between "accomplished by" and "display or use of" language contained in the respective statute. Especially aggravated kidnapping contains the language of false imprisonment "accomplished with a deadly weapon . . ." Aggravated kidnapping contains the language "while the defendant is in possession of a deadly weapon . . ." This subtle difference in language leads us to conclude that a question of fact was taken from the jury. Stated in a different fashion, did this defendant "accomplish" false imprisonment with a deadly weapon or, during the false imprisonment, did the defendant possess or threaten to use a deadly weapon. As earlier stated, following the analysis required by our supreme court, we concluded that it was error not to instruct the jury on aggravated kidnapping. We recognized that while the defendant in this case might have been convicted of especially aggravated kidnapping even had an instruction on aggravated kidnapping been given, "'the decision to convict on [the lesser-included offense] was taken away from the jury.'" Id. (quoting Ely, 48 S.W.3d at 727). It is our view that the State has been unable to establish that the error was harmless beyond a reasonable doubt. Accordingly, we reverse the defendant's conviction for especially aggravated kidnapping accomplished with a deadly weapon and remand for a new trial.

The defendant also asserts that, by instructing the jury to impose a sentence only for his conviction for first degree premeditated murder, the trial court "effectively vacated" the conviction for first degree felony murder, barring retrial in the event the defendant is granted a new trial. The trial court determined that it erred by originally instructing the jury to impose a sentence for both first degree murder convictions, but ruled that the error was harmless because it later corrected the instruction and told the jury to impose only one sentence. The judgment form clearly reflects that the convictions were merged and that the defendant's conviction for first degree felony murder was not vacated by the trial court. Further, the trial court indicated to counsel throughout the sentencing hearing that the convictions would be merged. Moreover, the trial court granted the defendant a new sentencing hearing because of an unrelated error and, after the State elected to withdraw its intent to seek a sentence of life without the possibility of parole, the defendant was automatically sentenced

to life imprisonment. See Tenn. Code Ann. § 39-13-208(b)-(c) (Supp. 1994). This issue is without merit.

## VII.

A sentencing hearing was held at which the trial court imposed the following sentences:

| Theft of property | 2 years |
| Especially aggravated kidnapping | 25 years |
| Rape | 8 years |

The trial court merged the convictions for especially aggravated kidnapping and ordered that the eight-year sentence for rape be served consecutively to the twenty-five year sentence for especially aggravated kidnapping. The sentences for rape and especially aggravated kidnapping were ordered to be served consecutively to the life sentence the defendant received for his first degree murder conviction. The effective sentence was, therefore, life plus thirty-three years. The defendant contends that the trial court misapplied enhancement factors in sentencing him for especially aggravated kidnapping and that the trial court improperly imposed consecutive sentences.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a *de novo* review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see State v. Jones, 883 S.W.2d 597, 600 (Tenn. 1994). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

At the time of the offense, the presumptive sentence for a Class A felony was at the midpoint within the range if there were no enhancement or mitigating factors. See Tenn. Code Ann. § 40-35-210(c) (1996). If there were enhancement factors but no mitigating factors, the trial court could set the sentence above the presumptive sentence. Tenn. Code Ann. § 40-35-210(d) (1996). A sentence involving both enhancement and mitigating factors required an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Tenn. Code Ann. §

40-35-210(e) (1996). The sentence would then be reduced within the range by any weight assigned to the mitigating factors present. Id.

Here, the trial court sentenced the defendant to twenty-five years for each count of especially aggravated kidnapping, the maximum sentence provided. See Tenn. Code Ann. § 40-35-112 (1990). In arriving at this sentence, the trial court concluded that the following enhancement factors were applicable:

> 1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;
> 2) The defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense;
> 3) The defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense;
> 4) The defendant had no hesitation about committing a crime when the risk to human life was high; and
> 5) The crime was committed under circumstances under which the potential for bodily injury to a victim was great.

See Tenn. Code Ann. § 40-35-114(1), (5), (9), (10), and (16). In mitigation, the trial court found that the defendant (1) had no prior criminal convictions; (2) had maintained employment; (3) had served in the military for ten years; (4) turned himself in to the authorities; and (5) had some potential for rehabilitation. Beginning at the midpoint in the range, the trial court determined that the enhancement factors greatly outweighed the mitigating factors and set the sentence at the maximum within the range.

The defendant asserts that the trial court misapplied all of the enhancement factors. Specifically, the defendant claims that enhancement factor (1), pertaining to the defendant's previous criminal behavior, should not apply because the evidence relied on by the trial court was adduced during a hearing on pretrial motions and not at trial or sentencing. The defendant contends that enhancement factors (9), relating to the use of a firearm, and (16), relating to the potential for bodily injury, should not apply because each is inherent in the offense of especially aggravated kidnapping. He asserts that enhancement factor (5), that the victim was treated with exceptional cruelty, was not borne out by the proof at trial. Finally, he argues that enhancement factor (10) is inapplicable because there was no proof that there was any risk to human life.

The trial court based its application of enhancement factor (1) on the testimony of Nancy Leonard at a hearing on pretrial motions. Nancy Leonard testified that the defendant kidnapped and raped her in the summer of 1996. Additionally, it was established that the defendant was arrested and charged in Illinois for the kidnapping and rape of Nancy Leonard. The defendant contends that the trial court should not have considered this evidence in sentencing the defendant because Tennessee Code Annotated section 40-35-210(b) limits the trial court's consideration to evidence adduced at trial or sentencing. The sentencing commission comments state that subsection (b) is

intended to permit "the court the greatest latitude in considering all available information in imposing the appropriate sentence and sentence alternative." Tenn. Code Ann. § 40-35-210(b), Sentencing Comm'n Comments. In our view, the trial court was permitted to consider all information available, including information presented at pretrial hearings.

To support the application of enhancement factor (5), the State must prove "exceptional" cruelty, normally found in cases of abuse or torture, "demonstrating a culpability distinct from and appreciably greater than that incident to" the crime. See State v. Poole, 945 S.W.2d 93, 98 (Tenn. 1997). We acknowledge the inherently cruel nature of both the rape and kidnapping of the victim and do not wish to minimize the anguish she suffered. We are unable to conclude, however, that the record supports application of the exceptional cruelty enhancement factor for especially aggravated kidnapping. Poole, 945 S.W.2d at 98; see also State v. Manning, 883 S.W.2d 635, 639 (Tenn. Crim. App. 1994) (rejecting this factor where victim abducted and forced to perform four sexual acts at knife point while verbally abused and threatened); State v. Edwards, 868 S.W.2d 682 (Tenn. Crim. App. 1993) (rejecting this factor where victim was gagged, threatened, and struck during commission of offense).

With regard to enhancement factors (10) and (16), we observe that this Court, in State v. Kern, determined those factors generally should not be considered when a defendant is convicted of especially aggravated kidnapping. 909 S.W.2d 5, 7-8 (Tenn. Crim. App. 1993). In Kern, this Court held those enhancement factors were inherent in the offense of especially aggravated kidnapping. See id. This Court has held, however, that factor (10) may still be applied where the defendant creates a high risk to the life of a person other than the victim. State v. Bingham, 910 S.W.2d 448, 452 (Tenn. Crim. App. 1995). Here, the trial court based its application of factor (10) upon the presence of the Tams family in the parking lot where the initial shot was fired and the presence of Crystal Jarrett in the lobby of the Econo Lodge. With regard to factor (16), however, the express language of the statute indicates that it can only be applied when the risk of bodily injury is to the victim. See Tenn. Code Ann. § 40-35-114(16). Recently, in State v. Imfeld, 70 S.W.3d 698 (Tenn. 2002), our high court held that enhancement factor (16) applies only when the defendant creates a great risk of injury to a victim and does not apply when there is a risk of injury to others who are simply present at the scene of the crime. Id. at 706. Our supreme court ruled that enhancement factor (10) is the appropriate factor to be applied when there is a risk to the life of someone other than the victim, as is the case here. Id. at 707. Accordingly, the trial court erred by utilizing factor (16) to increase the defendant's sentence.

In concluding that enhancement factor (9) was applicable, the trial court stated that it accredited the jury's determination that the defendant employed a firearm during the commission of the especially aggravated kidnapping. There was no evidence that the defendant employed the firearm at any time before removing it from his pocket to shoot the victim. Nevertheless, the defendant himself admitted that he possessed the firearm from the time he left Fort Campbell the afternoon before the shooting. Moreover, the evidence established that the defendant was ready to use the weapon if necessary. Finally, the defendant was a Special Forces officer whose training

made him particularly proficient with a weapon. Under these circumstances, enhancement factor (9) is applicable.

Notwithstanding our determination that the trial court erred by applying enhancement factors (5) and (16), in our view, the sentence of twenty-five years is warranted. Accordingly, this issue is without merit.

The defendant also complains that the trial court erred by ordering his sentences for rape and especially aggravated kidnapping to be served consecutively to each other and to his life sentence. Prior to the enactment of the Criminal Sentencing Reform Act of 1989, the limited classifications for the imposition of consecutive sentences were set out in Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976). In that case, our supreme court ruled that aggravating circumstances must be present before placement in any one of the classifications. Later, in State v. Taylor, 739 S.W.2d 227 (Tenn. 1987), the court established an additional category for those defendants convicted of two or more statutory offenses involving sexual abuse of minors. There were, however, additional words of caution:

> [C]onsecutive sentences should not routinely be imposed . . . and . . . the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved.

Taylor, 739 S.W.2d at 230. The Sentencing Comm'n Comments adopted the cautionary language. Tenn. Code Ann. § 40-35-115, Sentencing Commission Comments. The 1989 Act is, in essence, the codification of the holdings in Gray and Taylor; consecutive sentences may be imposed in the discretion of the trial court only upon a determination that one or more of the following criteria[7] exist:

(1) The defendant is a professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;

---

[7]The first four criteria are found in Gray. A fifth category in Gray, based on a specific number of prior felony convictions, may enhance the sentence range but is no longer a listed criterion. See Tenn. Code Ann. § 40-35-115, Sentencing Commission Comments.

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims; or

(6) The defendant is sentenced for an offense committed while on probation;

(7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b). The length of the sentence, when consecutive in nature, must be "justly deserved in relation to the seriousness of the offense," Tenn. Code Ann. § 40-35-102(1), and "no greater than that deserved" under the circumstances, Tenn. Code Ann. § 40-35-103(2); State v. Lane, 3 S.W.3d 456 (Tenn. 1999).

The trial court determined that the defendant was "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Further, the trial court concluded that consecutive sentences were warranted "to protect the public from further misconduct by this defendant." The trial court found that "[e]ven if [the defendant posed no danger] to the general public he certainly is a serious danger to any person he might become involved in a relationship with that doesn't work out the way he thinks it should." In our view, the trial court did not abuse its discretion in ordering consecutive sentencing.

## VIII.

As his final challenge, the defendant asserts that the cumulative effect of the trial court's errors denied him a fair trial. While we have determined that the trial court committed reversible error with regard to the defendant's conviction for especially aggravated kidnapping accomplished with a deadly weapon, this alone does not require that the defendant receive a new trial on all of his convictions. Further, we have determined that any other errors committed by the trial court were harmless. This issue is without merit.

## CONCLUSION

For the foregoing reasons, the defendant's conviction on especially aggravated kidnapping accomplished by the use of a deadly weapon is reversed and remanded for a new trial because of failure to instruct the jury as to lesser-included offenses. We affirm the convictions and judgments for first degree murder, especially aggravated kidnapping where the victim suffers serious bodily injury, rape, and theft over $1,000. We conclude that the sentences imposed were proper and remain undisturbed.

_____
JOHN EVERETT WILLIAMS, JUDGE